Filed 3/5/25 (unmodified opn. attached)

<u>**CERTIFIED FOR PUBLICATION**</u>

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CIVIL RIGHTS DEPARTMENT, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> CATHY'S CREATIONS, INC. et al., <br><br> Defendants and Respondents; <br><br> EILEEN RODRIGUEZ-DEL RIO et al., <br><br> Real Parties in Interest. | F085800 <br><br> (Kern Super. Ct. No. BCV-18-102633) <br><br> **ORDER DENYING PETITION FOR REHEARING AND MODIFYING OPINION (NO CHANGE IN JUDGMENT)** |

**THE COURT:**

It is ordered that respondents' petition for rehearing is denied.

It is further ordered that the published opinion filed herein on February 11, 2025, be modified as follows:

1.     On page 5, footnote 2 is modified to add the following text at the end of existing footnote 2:

> "Additionally, while Mireya indicated they had separately purchased a wedding topper, she testified they never requested a cake topper from Tastries and the cake they ultimately obtained did not feature a topper. Eileen similarly testified they did not request or discuss a cake topper with the employee of Tastries, nor did they plan to purchase one from Tastries."

2.     On page 15, the first full paragraph is deleted in its entirety and replaced with the following paragraph:

> "Generally, policies that make a facial distinction based on an enumerated protected characteristic have been held to be unlawful as arbitrary, invidious or unreasonable discrimination.  (See *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 32–33 (*Koire*) [facially discriminatory pricing policies favoring women unlawful under the UCRA]; see also *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 175–176 (*Angelucci*) [pricing policies making facial distinction on the basis of sex violate the UCRA; the plaintiffs sufficiently alleged injury when such a policy was applied to them].)  Likewise, policies that make a facial distinction based on an unenumerated characteristic may be found unlawful if the distinction constitutes "'arbitrary, invidious or unreasonable discrimination.'"[1] (*Javorsky v. Western Athletic Clubs, Inc.* (2015) 242 Cal.App.4th 1386, 1398; see *Liapes, supra*, 95 Cal.App.5th at p. 926 [program and algorithm that facially excludes women and older people from receiving ads combined with evidence of disparate impact adequately alleged violation of the UCRA]; *Marina Point, supra*, 30 Cal.3d at p. 745 [exclusion of children from an apartment complex unlawful under the UCRA].) Strong public policy based on a compelling societal interest, typically evidenced by statutory enactments, may support as reasonable (and thus not arbitrary) an otherwise prohibited discriminatory distinction, such as, for example, excluding children from bars.  (*Koire, supra*, 40 Cal.3d at p. 31; accord, *Marina Point, supra*, at pp. 741–742.)"

3.     On page 33, the second full paragraph, beginning with the text "However," is deleted in its entirety and replaced with the following paragraph:

> "However, the decisional authority defendants point to as recognizing lawful distinctions in treatment under the UCRA relate nearly exclusively to unenumerated characteristics *or*, in a singular case, revolve around a distinction based on disability expressly recognized by the Legislature (*Chabner v. United of Omaha Life Ins. Co.* (9th Cir. 2000) 225 F.3d 1042, 1050 [Ins. Code, § 10144 expressly permits life insurance premium rate differential based on actuarial tables]), none of which include any distinction in treatment based on sexual orientation.  Narrow

---

[1]     We are not suggesting the lawfulness of a policy drawing a facial distinction based on a protected characteristic is assessed under a different or less stringent standard because it is unenumerated.

2.

distinctions based on age, for example, have been recognized as lawful where compelling societal interests justify a difference in treatment, which are frequently evidenced by statute. (See *Koire, supra*, 40 Cal.3d at p. 38 [no strong public policy supported sex-based price discounts similar to those recognized on the basis of age].) Defendants point to no compelling societal interests that support a business establishment making a distinction in service based on sexual orientation. Rather, there is strong public policy favoring the elimination of distinctions based on sexual orientation with the UCRA being one such statute evidencing it. (See, e.g., Gov. Code, § 12920 [barring sexual orientation discrimination in employment]; *id.*, § 12955, subd. (a) [barring sexual orientation discrimination in housing]; *id.,* § 11135, subd. (a) [barring sexual orientation discrimination in programs operated by, or that are receiving financial assistance from, the state].)"

4.     On page 50, in original footnote 18 (now fn. 19), the following text is added at the end of original footnote 18:

"We make this comment not because the cake the Rodriguez-Del Rios sought was available from the daily display case, but as an observation the design standards would preclude a same-sex couple from preordering a cake for their wedding from the daily display case."

5.     On page 55, in the first and only full paragraph, the third sentence beginning with the text "Miller's personal intent," is modified to read as follows:

"Miller's personal intent to send such a message is evidenced by Tastries's design standards, but, as the CRD points out, the cake here bore no evidence of that intent; the cake conveyed no particular message about marriage at all, let alone Miller's intended message—implicating the second element discussed below."

6.     On page 58 (in part II.D. of the Discussion, under the heading Conclusion), a new paragraph is inserted between the first and second paragraphs to read as follows:

"To hold otherwise would expand the concept of speech to encompass routine consumer products bearing no indicia of expression, which would drain the First Amendment of meaning in a manner we find unsupported by our nation's high court's jurisprudence. Considered as expressive conduct, the act of preparing and delivering before a wedding celebration this nondescript, multi-purpose cake is unlikely to be understood by a viewer as communicating any message of the baker, let alone a specific message about marriage. And no explanatory conversation

about an intended message, such as through sales standards or a conversation prior to sale, can transform such conduct into symbolic speech.  (*FAIR, supra*, 547 U.S. at p. 66.)  Given the circumstances here, a contrary conclusion would support an overly broad view that producing and selling a routine consumer product for an event constitutes the symbolic speech of the vendor whenever a message is intended.  Logically, this would apply to sales conduct beyond the scope of weddings and sincerely held Christian beliefs about same-sex marriage.  We decline to extend the parameters of protected expression to include such a broad variety of marketplace conduct."

Except for the modifications set forth, the opinion previously filed remains unchanged.

This modification does not effect a change in the judgment.



MEEHAN, J.

WE CONCUR:


DETJEN, Acting P. J.


SMITH, J.

4.

Filed 2/11/25 (unmodified opinion)

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CIVIL RIGHTS DEPARTMENT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CATHY'S CREATIONS, INC., et al.,<br><br>    Defendants and Respondents;<br><br>EILEEN RODRIGUEZ-DEL RIO et al.,<br><br>    Real Parties in Interest. | F085800<br><br>(Super. Ct. No. BCV-18-102633)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  J. Eric Bradshaw, Judge.

Rob Bonta, Attorney General, Michael L. Newman, Assistant Attorney General, William H. Downer, Carly J. Munson, Lisa C. Ehrlich and Gary D. Rowe, Deputy Attorneys General, for Plaintiff and Appellant.

Amanda Goad, Elizabeth Gill, Efaon Cobb, Michelle Fraling and Aditi Fruitwala for ACLU, ACLU of Southern California, ACLU of Northern California and ACLU of San Diego & Imperial Counties as Amici Curiae on behalf of Plaintiff and Appellant.

Shannon Minter for National Center for Lesbian Rights; Jennifer C. Pizer for LAMBDA Legal Defense and Education Fund; Mary L. Bonauto, Gary D. Buseck and Chris Erchull for GLBTQ Legal Advocates & Defenders as Amici Curiae on behalf of Plaintiff and Appellant.

Davis Wright Tremaine and Samantha Lachman; Bradley Girard and Jenny Samuels for Americans United for Separation of Church and State as Amicus Curiae on behalf of Plaintiff and Appellant.

Morrison & Foerster, Richard S.J. Hung, Bonnie Lau, Camille Framroze and Justin K. Rezkalla; Nisha Kashyap for Lawyers' Committee for Civil Rights of the San Francisco Bay Area; Public Counsel Amanda M. Savage and Yi Li as Amicus Curiae on behalf of Plaintiff and Appellant.

LiMandri & Jonna, Charles S. LiMandri, Paul M. Jonna and Jeffrey M. Trissell; The Becket Fund for Religious Liberty, Eric C. Rassbach, Adèle A. Keim and Andrea R. Butler for Defendants and Respondents.

Alan J. Reinach for Church-State Council; Eric W. Treene and Asma Uddin for The Catholic University of America, Columbus School of Law, Religious Liberty Clinic as Amici Curiae on behalf of Defendants and Respondents.

-ooOoo-

**INTRODUCTION**

This appeal involves a bakery's refusal to sell a predesigned white cake, popularly sold for a variety of events, because it was intended for use at the customers' same-sex wedding reception. The State of California, through the Civil Rights Department (the CRD), filed suit on behalf of real parties in interest Eileen and Mireya Rodriguez-Del Rio (the Rodriguez-Del Rios) when Tastries Bakery (Tastries) refused to provide them the cake for their wedding pursuant to the bakery's policy that prohibited the sale of any preordered cake for a same-sex couple's wedding. The case culminated in a bench trial on the CRD's claim of discrimination under the Unruh Civil Rights Act (Civ. Code, § 51 et seq. (UCRA)), and the free speech and free exercise affirmative defenses of defendants Tastries, Tastries's owner Cathy's Creations, Inc. (Cathy's Creations), and Cathy's Creations's sole shareholder Catharine Miller (Miller) (collectively defendants).[2]

The trial court concluded there was no violation of the UCRA because the CRD failed to prove intentional discrimination, and concluded Miller's referral of the Rodriguez-Del Rios to another bakery constituted full and equal access under the UCRA. The trial court proceeded to consider defendants' affirmative defenses as an alternative matter, and concluded the preparation of a preordered cake by defendants *always* constitutes expression protected by the federal Constitution's First Amendment when it is sold for a wedding, and, as applied here, concluded the UCRA compelled defendants to speak a message about marriage to which they objected. The trial court rejected defendants' defense under the free exercise clause of both the federal and state Constitutions.

The CRD appeals and challenges the trial court's construction and application of the UCRA's intentional discrimination element, and its interpretation and application of decisional authority in concluding Miller's referral of the couple to a separate business

---

[2] Unless indicated otherwise, all statutory references are to the Civil Code.

constitutes full and equal access under the UCRA. The CRD and defendants also challenge the trial court's determinations as to defendants' affirmative defenses.

For the reasons explained below, we conclude the trial court erred in its determination that Tastries's policy was facially neutral and, as a result, misconstrued the intentional discrimination standard to require evidence of malice or ill will. Application of the policy here pivots upon the sexual orientation of the end user—the policy cannot apply or operate until the same-sex status of the couple is identified. Despite that the underlying rationale for the policy is rooted in a sincerely held religious belief about marriage, held in good faith without ill will or malice, the policy nonetheless requires a distinction in service that is based solely on, and because of, the end users' sexual orientation. The relevant and undisputed facts about the policy and its application here necessarily establish intentional discrimination.

We also conclude Miller's referral to a separate business did not satisfy the UCRA's full and equal access requirement. The applicable case authority does not contemplate, let alone authorize, a referral to an entirely separate business entity as full and equal access. Interpreting the UCRA in this manner would not only thwart the bedrock antidiscrimination purposes of the statute, it would entirely undermine the statute's operation as a public accommodations law. Under such a rule, business establishments would be free to refuse service to anyone on account of protected characteristics so long as they told those customers there was another comparable business in existence confirmed to have no objection to providing service.

As for defendants' constitutional affirmative defenses, under our independent review, we conclude defendants' refusal to provide the Rodriguez-Del Rios the predesigned, multi-purpose white cake requested was not protected expression under the federal Constitution's free speech guarantee. A three-tiered, plain white cake with no writing, engravings, adornments, symbols or images is not pure speech. Nor can the act of preparing a predesigned, multi-purpose, plain white cake—an ordinary commercial

4.

product—and delivering it prior to the wedding constitute the symbolic speech of the vendor. Further, we conclude the trial court properly rejected defendants' free exercise challenges under governing case authority. Accordingly, we reverse and remand.

## FACTUAL BACKGROUND

### I.     The Cake Tastries Refused to Sell to the Rodriguez-Del Rios

As this case involves a specific denial of service, we begin with a brief description of the cake Tastries refused to sell. For their wedding, the Rodriguez-Del Rios sought a cake with a simple design, and chose one based on a sample (nonedible) cake displayed in Tastries's bakery. It was to have three tiers with white buttercream frosting without any writing, symbols, engravings, images or toppers.[3] According to the Tastries's manager who originally helped the couple with the order, it was a "very popular," "simple" design sold for a variety of events including birthdays, baby showers (left, *post*), weddings (right, *post*), and quinceaneras. Defendants refused to prepare and sell the cake




---

[3]     Mireya testified when she came into Tastries the first time, she had an idea of what she wanted. After she and Eileen discussed the cake with an employee of Tastries, there was nothing left in Mireya's mind to discuss about the design of the cake. Eileen similarly testified that after their conversation with the employee on their first visit, there were no "other choices" to make about the design of the cake beyond flavors.

to the Rodriguez-Del Rios, however, because the couple planned to serve it at their same-sex wedding reception.

After Tastries's refusal, the Rodriguez-Del Rios ultimately obtained a cake of the same design from another baker, pictured *post*:



We turn now to the broader, factual context surrounding this denial.

## II.     Tastries

Catharine Miller owns and operates Tastries, a small commercial bakery in Bakersfield, which employs approximately 18 people, including Miller and her husband. The bakery sells a variety of baked goods, which are available daily in a display case and can be purchased by anyone without restriction. The display case of daily goods can accommodate cakes, but only single-tiered cakes that are meant for last-minute purchasing. The bakery also sells preordered baked goods to be produced for a specific date, which encompasses cakes for a variety of occasions, including weddings. Tastries's policy is that all preordered baked goods are considered "custom," regardless of the type of product or its design specifications. If a customer wants a cake identical to one in the daily display case, but wants the cake prepared for a specific date, it is considered by Tastries to be a "custom" cake.

Miller is a devout Christian. She believes that Tastries is God's business, and that she and her husband work in service to God. She has Bible verses on her business cards, she prays with the staff before meetings, and they work as a family—helping each other

and working together. They play Christian music at the store, and sell a small variety of boutique merchandise, some with Christian themes.

Approximately 30 percent of Tastries's revenue comes from wedding cake sales. All preordered wedding cakes are considered custom products by Tastries, regardless of their design. When customers order a wedding cake, Tastries collects information such as the name of the bride and the groom, and a consultation will be scheduled where the cake's design will be discussed. Typically, Miller will personally conduct this consultation, although in the past other employees have done it. Miller requires the engaged couple, except in certain circumstances, to both be present for the cake consultation. She has developed a packet, which she goes over with the couple during the consultation that explains various wedding traditions, including those relevant to a wedding cake, and the packet includes various Bible verses and talks about how marriage is between a man and a woman; Miller informs the couple of the Bible verses she has used in weddings and how many weddings she has coordinated. Given these circumstances, Miller intends each cake, regardless of appearance, to convey a message that the marriage is "ordained by God between a man and a woman and we are here to celebrate that with you."

The consultation includes a tasting, where the couple has a chance to sample cupcakes with the different available fillings and flavors. When Miller conducts the consultation, they talk about the colors for the wedding, the flowers, and the number of guests they wish to serve because "all of that comes into play when [Miller] is designing their cake." About 40 to 50 percent of the time, couples will bring in a picture of a cake design, and Tastries will replicate it so long as Miller believes the cake's appearance is beautiful. Tastries also has many display cakes in the bakery and photographs of cake designs for couples to choose from. Some customers leave the design entirely up to Tastries after consulting about flavors and colors.

In completing a wedding cake order, usually at least five to eight different employees work on some aspect of the cake—from baking it, to making fillings and frostings, to decorating and then (often) delivering the cake to the wedding site. Approximately 95 percent of wedding cake orders are delivered, and setting up the cake at a reception site can take 15 minutes to an hour. Many times, some wedding guests or the wedding party are at the venue site at the time of delivery. Miller may be involved in all aspects of a cake order, but she does not necessarily bake or decorate any particular cake. Since the events of this case, Miller personally conducts most of the design/tasting consultations.

Since opening Tastries, Miller has developed design standards for Tastries's products so that they reflect her beliefs. For the period of time relevant to this case, Tastries used the following design standards for its products:

> "We do not accept requests that do **not** meet Tastries Standards of Service, including but not limited to designs or an intended purpose based on the following:
>
> > "•Requests portraying explicit sexual content
> >
> > "•Requests promoting marijuana or casual drug use
> >
> > "•Requests featuring alcohol products or drunkenness
> >
> > "•Requests presenting anything offensive, demeaning or violent
> >
> > "•Requests depicting gore, witches, spirits, and satanic or violent content
> >
> > "•Requests that violate fundamental Christian principals [*sic*]; wedding cakes must not contradict God's sacrament of marriage between a man and a woman"[4]

---

[4] There were several versions of the design standards in existence during the relevant time frame, but, as the trial court found, they varied only in minor detail.

The standards refer to Miller's mission to create "custom designs that are Creative, Uplifting, Inspirational and Affirming" (boldface omitted), and that are "lovely, praiseworthy, or of good report[.]"

These design standards apply to all baked goods, and Miller has refused to make products that do not comport with the design standards. For example, she has refused to make products with a marijuana theme, and she refused to provide a cake for a man who wanted to use the cake at his anniversary party to announce his intention to seek a divorce.

Miller developed the standards in consultation with her minister; the final standard was added in 2015 after same-sex marriage was recognized as a fundamental right. Miller intends the design policy to prohibit the provision of any preordered baked good for use in the celebration of same-sex marriage, including engagements, weddings and anniversaries. She believes that by providing any preordered product for the celebration of same-sex marriage, Tastries is placing its stamp of approval on that marriage, which is inconsistent with Miller's religious belief that marriage is between a man and a woman. Thus, specific to wedding cakes, Miller will not provide any preordered cake—no matter its design—for a same-sex wedding, even though she will sell the identical product for an opposite-sex couple's wedding. According to Miller, her purpose for refusing certain products for certain people is not to exclude anyone on the basis of sexual orientation, but to follow her conscience and her sincerely held religious beliefs that marriage is limited to couples comprising one man and one woman.

Miller has referred same-sex couples seeking a wedding cake to *Gimme Some Sugar* approximately three times. The referral process was developed when a same-sex couple sought to purchase a wedding cake from Tastries. Miller became uncomfortable and concluded she could not provide the cake because of her beliefs. She had already taken payment for the order, so she sought out the owner of *Gimme Some Sugar*, who

9.

agreed to take over the order. In that instance, the couple came back and thanked Miller, told her the cake was wonderful, and they have been back at Tastries since then.

Despite her design policy prohibiting the sale of preordered cakes for same-sex weddings, four of Tastries's former employees had surreptitiously supplied wedding cakes on prior occasions to at least two same-sex couples without Miller's knowledge.

### III.    Rodriguez-Del Rios' Order Refused

Real parties in interest Mireya and Eileen Rodriguez-Del Rio are a same-sex couple who were married in December 2016 in a small ceremony with friends and family. The couple wanted to celebrate with a larger group and planned to exchange vows and host a traditional wedding reception in October 2017.

In planning the 2017 wedding event, the couple visited several bakeries, including Tastries. Eileen brought home cupcakes from *Gimme Some Sugar* to taste the flavors, but they decided the samples were too sweet. On August 16, 2017, they visited Tastries, where an employee, not Miller, assisted them in selecting a cake for their wedding. The couple chose a cake based on one of Tastries's preexisting, inedible sample cake displays, which the employee who assisted them described at trial as a simple and popular design sold for many different types of events: a round, three-tiered cake with no writing or cake topper that was to be delivered about an hour before their event; the employee suggested the couple come back to do a cake tasting. The employee never told them Tastries would not provide a cake for a lesbian couple. The Rodriguez-Del Rios returned to the bakery for a tasting on August 26, 2017, with two of their friends and Eileen's mother. When they got to the bakery, the employee who assisted them previously told them Miller was going to take over.

Miller, who was unaware the Rodriguez-Del Rios had already discussed the cake design with the employee, asked them questions about the cake they wanted. Miller initially believed it was a heterosexual couple with their mother and a maid and man of

10.

honor.  The order form Miller had was blank, so she handed it to Mireya thinking she was the bride.  Miller's questions struck the Rodriguez-Del Rios as odd because they had already gone over this information in their first visit—they thought they were there only to taste flavors for the filling and frosting.  Miller asked who the groom was, and that was when she discovered it was a same-sex marriage.  At that point, Miller excused herself for a moment, and then returned to tell them she was sorry, she could not supply their wedding cake, and she would refer them to *Gimme Some Sugar*.  Eileen asked why, and Miller said she could not be part of a same-sex wedding due to her religious beliefs.  Although Miller told them they could stay and complete the sampling, the couple did not see the point of doing so.  A member of the group took the order form or the clipboard from Miller, and the group walked out.

The Rodriguez-Del Rios were shocked, humiliated and frustrated to learn Tastries would not provide them a wedding cake.  Mireya felt rejected, and Eileen was upset and angry because they hurt Mireya.  Eileen was concerned about removing her mother and Mireya from the situation.  When the group got to the parking lot, they decided to get coffee to process what had happened.  Members of the group posted about their experience on social media.  After the group left the coffee shop, Mireya and Eileen ran additional errands.  Mireya began crying, which resulted in a bloody nose.

Within hours after the group left the bakery, Tastries started receiving threatening telephone calls and pornographic emails; Tastries subsequently lost corporate accounts, and people left low ratings on social media accounts.  Miller and her employees received threats; Miller had to shorten Tastries's hours of operation.  An article was written about the Rodriguez-Del Rios that was untrue; hurtful and threatening comments were made about the Rodriguez-Del Rios, Miller and Tastries.

The Rodriguez-Del Rios ultimately obtained a cake from another bakery, which was very similar to the cake they had wanted Tastries to provide.  The plain, white cake was three tiers, two of which were made of Styrofoam, and adorned with real flowers.  It

was placed in the center of the reception venue for a few minutes when it was cut during the event.

## IV. Procedural Background

The CRD filed suit against defendants in October 2018 seeking injunctive relief and monetary damages for violations of the UCRA. In September 2021, the parties each filed motions for summary judgment, which were denied. The matter proceeded to a bench trial in July 2022. The trial court issued a tentative ruling in favor of defendants, and the CRD requested a statement of decision pursuant to Code of Civil Procedure section 632. After both parties filed various objections, the trial court adopted its tentative ruling as its statement of decision, and judgment was entered on December 27, 2022.

In its statement of decision, the trial court concluded defendants' design standard that precluded selling wedding cakes for same-sex couples was facially neutral. The trial court explained defendants would not design or offer to any person a wedding cake that contradicts "'God's sacrament of marriage between a man and a woman.'" The trial court found no evidence indicating the facially neutral policy was merely a pretext to discriminate. The trial court also concluded Miller's referral to *Gimme Some Sugar* constituted full and equal access under the UCRA pursuant to the trial court's interpretation of relevant case authority. In sum, the trial court concluded the CRD had failed to prove that defendants violated the UCRA.

The trial court then, as an alternative matter, reached defendants' First Amendment defenses. Although concluding the UCRA substantially burdened Miller's free exercise of religion, the trial court found it was bound by the California Supreme Court's decision in *North Coast Women's Care Medical Group, Inc. v. Superior Court* (2008) 44 Cal.4th 1145 (*North Coast*), which held the UCRA is a valid and neutral law of general applicability that survives strict scrutiny. (*North Coast, supra*, at p. 1158.)

12.

As for defendants' First Amendment compelled speech defense, the trial court found defendants' wedding cakes were all artistic expression that constituted pure speech and amounted to expressive conduct that conveys support for a man and a woman uniting in the "sacrament" of marriage, that the union is a marriage and should be celebrated. The trial court applied strict scrutiny and found there was no compelling government interest that justified forcing defendants to convey a message about marriage with which they disagreed.

## DISCUSSION

### I.    The UCRA Violation

The UCRA mandates that "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (§ 51, subd. (b).)

"The purpose of the [UCRA] is to create and preserve 'a nondiscriminatory environment in California business establishments by "banishing" or "eradicating" arbitrary, invidious discrimination by such establishments.' (*Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 167 (*Angelucci*), citing *Isbister v. Boys' Club of Santa Cruz, Inc.* (1985) 40 Cal.3d 72, 75–76.)  'The [UCRA] stands as a bulwark protecting each person's inherent right to "full and equal" access to "all business establishments." (§ 51, subd. (b); see *Isbister, supra*, 40 Cal.3d at p. 75.)' (*Angelucci,* at p. 167.)  In enforcing the [UCRA], courts must consider its broad remedial purpose and overarching goal of deterring discriminatory practices by businesses. (*Angelucci,* at p. 167.; see *Isbister*, at p. 75.)  [The California Supreme Court has] consistently held that 'the [UCRA] must be construed liberally in order to carry out its purpose.' (*Angelucci*, at p. 167; see *Koire v.*

*Metro Car Wash* (1985) 40 Cal.3d 24, 28, (*Koire*).)" (*White v. Square, Inc.* (2019) 7 Cal.5th 1019, 1025 (*White*).)

While the UCRA expressly lists sex, race and other types of protected-characteristic discrimination, its list is illustrative rather than restrictive, and its protection against discrimination is not confined to the expressly articulated classes. (*Marina Point, Ltd. v. Wolfson* (1982) 30 Cal.3d 721, 732 (*Marina Point*) [the UCRA's "'language and its history compel the conclusion that the Legislature intended to prohibit *all arbitrary discrimination by business establishments*,'" regardless of whether the ground of discrimination is expressly set forth in the statute]; *Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1160–1169 (*Harris*) [establishing analytical framework for determining whether unenumerated protected class is cognizable under the UCRA].)

"In general, a person suffers discrimination under the [UCRA] when the person presents himself or herself to a business with an intent to use its services but encounters an exclusionary policy or practice that prevents him or her from using those services." (*White, supra*, 7 Cal.5th at p. 1023.) Unless an UCRA claim is based on an Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq. (ADA)) violation, a plaintiff is required to establish the defendant is a business enterprise that intentionally discriminates against and denies the plaintiff full and equal treatment of a service, advantage or accommodation based on the plaintiff's protected status. (Civ. Code, § 51, subd. (b); *Liapes v. Facebook, Inc.* (2023) 95 Cal.App.5th 910, 922 (*Liapes*); *Martinez v. Cot'n Wash, Inc.* (2022) 81 Cal.App.5th 1026, 1036 ["Unless an [UCRA] claim is based on an ADA violation," a plaintiff must prove intentional discrimination].) Intentional discrimination requires proof of "'willful, affirmative misconduct.'" (*Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824, 853 (*Koebke*), quoting *Harris, supra*, 52 Cal.3d at p. 1172.) To meet this standard, the plaintiff must show more than the disparate impact of a facially neutral policy on a particular protected group—e.g., establishing the

14.

policy was a pretext for discriminatory intent or was applied in a discriminatory manner. (*Koebke, supra*, at pp. 854–855.)

Policies that make a facial distinction based on an enumerated protected characteristic are unlawful. (See *Koire v. Metro Car Wash* (1985) 40 Cal.3d 24, 32–33 (*Koire*) [facially discriminatory pricing policies favoring women unlawful under the UCRA]; see also *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 175–176 (*Angelucci*) [pricing policies making facial distinction on the basis of sex violate the UCRA; the plaintiffs sufficiently alleged injury when such a policy was applied to them].) Policies that make a facial distinction based on an unenumerated characteristic may be found unlawful if the distinction constitutes "'arbitrary, invidious or unreasonable discrimination.'" (*Javorsky v. Western Athletic Clubs, Inc.* (2015) 242 Cal.App.4th 1386, 1398; see *Liapes, supra*, 95 Cal.App.5th at p. 926 [program and algorithm that facially excludes women and older people from receiving ads combined with evidence of disparate impact adequately alleged violation of the UCRA].)

### A. Intentional Discrimination

In concluding defendants did not intentionally discriminate for purposes of the UCRA, the trial court found Miller's "*only* intent, her only motivation, [in refusing the Rodriguez-Del Rios a wedding cake] was fidelity to her sincere Christian beliefs"—a motivation the trial court concluded was not unreasonable or arbitrary under the statute. The CRD argues that, where a policy facially discriminates on the basis of a protected characteristic, as the wedding cake design standard does here, liability does not depend on *why* someone intentionally discriminates. The CRD contends the trial court's reliance on Miller's sincere religious beliefs as demonstrating no malice toward same-sex couples is irrelevant and misinterprets the standard for proving intentional discrimination.

Defendants contend the design standard at issue is facially neutral because, as the trial court concluded, it applies equally to everyone, regardless of sexual orientation: "Miller and Tastries do not design and do not offer to *any* person—regardless of sexual

15.

orientation—custom wedding cakes that 'contradict God's sacrament of marriage between a man and a woman.'" At best, defendants argue, the CRD presented evidence of a disparate impact based on sexual orientation stemming from a facially neutral policy, which is insufficient to show intentional discrimination under the UCRA. Moreover, defendants argue, there is no other evidence that supported a finding of intentional discrimination because the trial court found the design standards were not created or applied as a pretext to discriminate or to make a distinction based on a person's sexual orientation.

### 1. Tastries's Design Standard is Facially Discriminatory

A facially discriminatory policy is one which on its face applies less favorably to a protected group. (See, e.g., *Community House, Inc. v. City of Boise* (9th Cir. 2007) 490 F.3d 1041, 1048.) A facially neutral policy applies equally to all persons; a disparate impact analysis "relies on the *effects* of a facially neutral policy on a particular group" (*Koebke, supra*, 36 Cal.4th at p. 854), and "it requires inferring discriminatory intent solely from those effects" (*Liapes, supra*, 95 Cal.App.5th at p. 925). Here, there was no factual dispute as to the literal contents of Tastries's design standards for the trial court to resolve, nor was there any dispute that Miller refused to provide a wedding cake to the Rodriguez-Del Rios pursuant to those standards. The CRD contends the trial court erred by concluding the standard at issue applied equally to everyone—i.e., that it was facially neutral.

In this context, whether a business establishment's undisputed written policy is facially neutral or discriminatory under the UCRA involves application of the rule of law to the relevant and undisputed facts. As such, our review on this specific issue is de novo. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799 ["When the decisive facts are undisputed, we are confronted with a question of law and are not bound by the findings of the trial court."]; see *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 385 (*Haworth*) [where legal question predominates in mixed question of law and fact, appellate review is

16.

de novo]; see also *Koebke, supra*, 36 Cal.4th at p. 854 [determining in summary judgment context that country club's membership benefits policy was facially neutral].)

Here, Miller developed standards of service that restrict the design of products Tastries will create *and* the "intended purpose" for which the product will be used. The standards of service list six types of requests for a preordered baked good that Tastries will not honor: (1) portraying explicit sexual content; (2) promoting marijuana or casual drug use; (3) featuring alcohol products or drunkenness; (4) presenting anything offensive, demeaning or violent; and (5) depicting gore, witches, spirits, and satanic or demonic content. These standards focus on the design of the product. The sixth and final category, however, specifies Tastries will not provide any preordered baked goods that "violate fundamental Christian princip[les]," and specifies "wedding cakes must not contradict God's sacrament of marriage between a man and a woman."

The trial court concluded this last standard, which was the basis for Miller's refusal of Rodriguez-Del Rios' wedding cake order, applies to everyone equally because Tastries will not sell a preordered cake to *anyone* for purposes of a same-sex wedding. But the sixth standard, which precludes a wedding cake whose design *or intended purpose* "contradict[s] God's sacrament of marriage between a man and a woman," is a status-based limitation because it expressly precludes a purpose that is defined around, and indelibly tied to, the sexual orientation of the end user for whom the cake is sold. That is what distinguishes it from all the other design standards concerning the design of the cake, and instead expressly targets an intended purpose inextricably tied to a protected characteristic.[5] Different from the other standards, the preclusion on providing wedding cakes for the purpose of same-sex marriage cannot be applied until and unless

---

[5] To that end, Miller's refusal to sell a so-called "divorce" cake as an example of how the policy applies equally to everyone is an inapt comparison. When Miller refused to make a cake for a gentleman who wanted to make a surprise request for a divorce during a wedding anniversary party, the prohibited purpose was not tied to and defined by the end user's protected characteristics.

the same-sex status of the marrying couple is ascertained because *that* is the criterion on which it pivots. (Cf. *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n* (2018) 584 U.S. 617, 672 (dis. opn. of Ginsberg, J.) (*Masterpiece*) [observing that baker's declination "to make a cake he found offensive where the offensiveness of the product was determined solely by the identity of the customer requesting it" is distinct from cakes declined due to demeaning message requested, which did not turn on protected characteristic of the customer].) And, because this is so, it is a standard that does not apply "alike to persons of every … sexual orientation .…" (§ 51, subd. (c).) Indeed, Miller testified she would have provided to a heterosexual couple the same cake she refused to provide to the Rodriguez-Del Rios under this standard.

The design standard is not transformed into a neutral policy simply because Tastries will sell *other* products (such as items in the bakery case or preordered baked goods not intended for same-sex weddings) to nonheterosexual customers. The UCRA "clearly is not limited to [wholly] exclusionary practices" but requires "equal treatment of patrons in all aspects of the business." (*Koire, supra*, 40 Cal.3d at p. 29.) Additionally, Tastries's refusal to sell a wedding cake to anyone—regardless of sexual orientation—for the purpose of a same-sex wedding does not render the standard applicable alike to every person regardless of sexual orientation. Section 51, subdivision (e)(6), defines sexual orientation to include those persons associated with someone who has, or is perceived to have, that protected characteristic. As the CRD correctly contends, a customer buying a preordered cake for a same-sex wedding is doubtlessly associated with the same-sex couple who is marrying, and the refusal to furnish a product because it will be used by the customer to celebrate a same-sex wedding will invariably be based on that association.

Nor is the standard facially neutral because its limitation pertains to same-sex *marriage*. Drawing a distinction based on conduct (same-sex marriage), which is indelibly intertwined with a protected status (sexual orientation) has been rejected in several contexts. (See, e.g., *Christian Legal Society Chapter of the University of*

18.

*California, Hastings College of the Law v. Martinez* (2010) 561 U.S. 661, 672, 689 [no difference between organization's exclusion of those engaged in "'unrepentant homosexual conduct'" and exclusion of those based on their sexual orientation]; see also *Lawrence v. Texas* (2003) 539 U.S. 558, 575 ["[w]hen homosexual *conduct* is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual *persons* to discrimination" (italics added)]; cf. *Bray v. Alexandria Women's Health Clinic* (1993) 506 U.S. 263, 270 [explaining some conduct is so tied to a particular group that targeting the conduct can be readily inferred as an attempt to disfavor the group by pointing out "[a] tax on wearing yarmulkes is a tax on Jews"].) Indeed, same-sex marriage has been recognized by the United States Supreme Court as a fundamental expression of an individual's sexual orientation. (*Obergefell v. Hodges* (2015) 576 U.S. 644, 675 [laws prohibiting gay marriage "impos[e] … disability on gays and lesbians [and] serves to disrespect and subordinate them"]; *United States v. Windsor* (2013) 570 U.S. 744, 775 ["[The federal Defense of Marriage Act (1 U.S.C. § 7)] singles out a class of persons deemed by a State entitled to recognition and protection to enhance their own liberty."].)

Notably, the California Supreme Court considered this conduct/status distinction in the context of state marriage statutes and explained that "restricting marriage to a man and a woman cannot be understood as having merely a disparate impact on gay persons, but instead properly must be viewed as directly classifying and prescribing distinct treatment on the basis of sexual orientation. By limiting marriage to opposite-sex couples, the marriage statutes, realistically viewed, operate clearly and directly to impose different treatment on gay individuals because of their sexual orientation. By definition, gay individuals are persons who are sexually attracted to persons of the same sex and thus, if inclined to enter into a marriage relationship, would choose to marry a person of their own sex or gender. A statute that limits marriage to a union of persons of opposite sexes, thereby placing marriage outside the reach of couples of the same sex,

19.

unquestionably imposes different treatment on the basis of sexual orientation." (*In re Marriage Cases* (2008) 43 Cal.4th 757, 839–840, fn. omitted, superseded by constitutional amend. as stated in *Hollingsworth v. Perry* (2013) 570 U.S. 693, 701.)

This reasoning applies with equal force here: a business policy that permits preordered wedding cake sales only for opposite-sex couples, while refusing those services to same-sex couples, unquestionably imposes differential treatment on the basis of sexual orientation. If a business refuses its services to and/or for same-sex couples, it realistically operates "clearly and directly to impose different treatment on gay individuals because of their sexual orientation." (*In re Marriage Cases, supra*, 43 Cal.4th at p. 839; cf. *Smith v. Fair Employment & Housing Com.* (1996) 12 Cal.4th 1143, 1155–1156 [rejecting argument that refusing to rent to unmarried couple was aimed at assumptions about their sexual conduct rather than their marital status].)

Defendants draw a distinction between an exclusionary policy implemented because of a sincerely held religious belief about *marriage* and one aimed at individuals because of their sexual orientation. To conflate them, defendants argue, is a serious misstatement of Miller's religious beliefs. We do not question the sincerity of Miller's religious beliefs about marriage, and they are entitled to respect. But Miller's good-faith religious basis for why she makes this distinction does not alter what the design standard requires on its face: disparate treatment in wedding cake service based on the sexual orientation of the end user. Thus, the legal issue for purposes of the UCRA concerns the implementation and application of a policy in a public-facing business establishment that facially excludes service to a portion of the public because of a protected characteristic.

None of the facially neutral policies in other cases that defendants point to as analogous are comparable. For example, in *Turner v. Association of American Medical Colleges* (2008) 167 Cal.App.4th 1401, the challenged policy involved the standards for administration of the medical college admissions test, including a time limit for each section of the test. (*Id.* at p. 1409.) The plaintiffs, who had reading-related learning

20.

disabilities and/or attention deficit hyperactivity disorder, requested and were denied more time or a private room to take the medical college admissions test. (*Id.* at pp. 1404–1405.) The court noted the administration standards were facially neutral because they extended to all applicants regardless of their membership in a particular group. (*Id.* at p. 1409.)

The policy considered in *Koebke* was similarly neutral. (*Koebke, supra*, 36 Cal.4th at pp. 853–854.) There, a private country club maintained a policy that extended member benefits only to married spouses of members, which excluded same-sex partners who were prohibited by law from marrying at that time. The policy was deemed facially neutral because it applied equally to all unmarried individuals, regardless of their sexual orientation.[6] (*Koebke, supra*, at p. 854.) The denial of member benefits could be made without knowing anything about the sexual orientation of the person seeking them because the policy applied to anyone who was not married to a member.

Here, the policy's application hinges not on the act of marriage, but on the same-sex status of the couple to be married. Thus, the policy's purposeful exclusion of same-sex couples is facial discrimination *because of* sexual orientation. When Miller refused to supply the cake the Rodriguez-Del Rios ordered, she did so *because* they were not a heterosexual couple. The issue is not *why* Miller created and applied the policy, but that it facially precludes some services based on a protected characteristic. As adoption and application of the policy was purposeful and the policy was facially discriminatory, there can be no other conclusion but that Miller's refusal under the policy was intentionally discriminatory.

---

[6] The court held the plaintiff was entitled to pursue a discrimination claim based on *marital status* for the period of time following the passage of the California Domestic Partner Rights and Responsibilities Act of 2003 (Fam. Code, § 297 et seq.), and held the plaintiff was able to pursue an as-applied discrimination claim based on sexual orientation under the UCRA prior to passage of the Domestic Partner Rights and Responsibilities Act. (*Koebke, supra*, 36 Cal.4th at pp. 851–852.)

## 2. Reason for Adopting the Facially Discriminatory Policy is Not Relevant

In concluding intentional discrimination was not proven, the trial court found "Miller's *only* intent, her only motivation, was fidelity to her sincere Christian beliefs. Miller's only motivation in creating and following the design standards, and in declining to involve herself or her business in designing a wedding cake for a marriage at odds with her faith, was to observe and practice her own Christian faith" and that motivation "was not unreasonable, or arbitrary, nor did it emphasize irrelevant differences or perpetuate stereotypes."

This line of reasoning appears premised on the conclusion that Tastries's design standard regarding wedding cakes is facially neutral, evidencing only disparate impact insufficient by itself to show intentional discrimination. (*Harris, supra*, 52 Cal.3d at p. 1175.) However, when the design standard is rightfully understood as facially discriminatory, the fact that Miller's adoption of the discriminatory policy was driven by her sincerely held religious beliefs rather than malice or ill will is irrelevant to the issue of intentional discrimination. (Cf. *Smith v. Fair Employment & Housing Com., supra*, 12 Cal.4th at pp. 1160–1161 [assertion of sincerely held religious belief as the basis to deny unmarried couple housing evaluated only as a free exercise defense, and not in determining whether discrimination because of marital status constituted a violation of the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) (FEHA)].)[7] If it were otherwise, the assertion of a sincerely held religious belief (which is nonjusticiable)

---

[7] At the time of the refusal to rent in *Smith v. Fair Employment & Housing Com.* and currently, it is unlawful under FEHA for the owner of any housing accommodation to discriminate against any person because of marital status. (Gov. Code, § 12955, subd. (a); Stats. 1980, ch. 992, § 4, p. 3154.) In concluding that Smith's refusal to rent to an unmarried couple violated FEHA, and thus supported the Fair Employment and Housing Commission's administrative level decision that the landlord violated the statute, *Smith* deemed it unnecessary to decide whether the UCRA—which did not expressly enumerate marital status as a protected characteristic at that time—had the same effect. (*Smith v. Fair Employment & Housing Com., supra*, 12 Cal.4th at pp. 1160–1161, fn. 11.)

22.

as justification for a facially discriminatory policy would always result in a finding of nonintentionality, absent direct evidence of pretext.[8]  This is why the intentionality required by the UCRA relates to the purposefulness of the discriminatory action; it does not necessarily entail malice or a bias-driven rationale for the discriminatory act or policy.  (Black's Law Dict. (12th ed. 2024) p. 964, col. 1 [intentional means "[d]one with the aim of carrying out a given act; performed or brought about purposely"].)

It is undisputed that Miller purposefully refused to supply any wedding cake to the Rodriguez-Del Rios, and that she did so based on Tastries's facially discriminatory design standard, which she created.  In such an instance, Miller's underlying incentive for purposely adopting and applying the facially discriminatory policy does not affect, nor is it relevant to, the intentionality of the discrimination.  (Cf. *Los Angeles Dept. of Water & Power v. Manhart* (1978) 435 U.S. 702, 705, 716 [in the context of tit. VII of the Civ. Rights Act of 1964 (42 U.S.C. § 2000e et seq.), requirement that female employees make larger contributions to pension fund was a facially discriminatory policy despite that it was purportedly based on actuarial data related to lifespan and not on any malice or stereotyping].)

The standard jury instruction for UCRA claims (CACI No. 3060) underscores this conclusion.  The instruction requires a plaintiff to prove (1) the defendant denied the plaintiff full and equal accommodations, advantages, facilities, privileges, or services; (2) that a substantial motivating reason for the defendant's conduct was the plaintiff's membership in a protected class; (3) that the plaintiff was harmed; and (4) that the defendant's conduct was a substantial factor in causing the plaintiff's harm.  (CACI No. 3060.)  The use notes for CACI No. 3060 indicate the term "substantial motivating reason" was imported from the employment discrimination context under FEHA as

---

[8]     The potential implications of that proposition are astonishing in their breadth, and would undercut the entire purpose of the UCRA.

23.

articulated in *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 232, and was meant to express both the intent and causation between the protected classification and the defendant's conduct.[9]  Decisional authority in the FEHA context holds a "substantial motivating reason" need not be predicated on malice or ill will.  (*Wallace v. County of Stanislaus* (2016) 245 Cal.App.4th 109, 130–131 [where there is direct evidence of employer's motivation, substantial motivating reason does not require ill will].)[10]

Here, the design standard regarding wedding cakes specifically applies and operates around the sexual orientation of the couple to be married—it cannot even be applied unless or until defendants have ascertained the same-sex status of the couple.  Thus, a substantial motivating reason for refusing service under the policy necessarily was *because of* the sexual orientation of the couple, even though Miller bears no ill will or malice toward those of nonheterosexual orientation generally.

In sum, we conclude Tastries's sixth design standard pertaining to wedding cakes is facially discriminatory.  The evidence is undisputed that Miller purposefully created the policy and applied it to refuse to supply a cake for the Rodriguez-Del Rios.  Because the denial was based on a policy that facially discriminated on the basis of sexual orientation, a substantial motivating reason for the denial was necessarily because of the sexual orientation of the couple.  The underlying rationale for the policy—Miller's sincerely held religious beliefs—does not make the facially discriminatory policy any less violative of the UCRA.

---

[9]     CACI No. 2507 explains that a "'substantial motivating reason'" "is a reason that actually contributed to the [discriminatory act].  It must be more than a remote or trivial reason.  It does not have to be the only reason motivating the [discriminatory act]."

[10]     Defendants provided CACI No. 3060 to the trial court, and argued BAJI No. 7.92, which likewise uses the *substantial motivating factor* standard, states the elements required by the UCRA.  Neither party asserts "substantial motivating reason" standard is incorrectly applied to UCRA claims, and, as such, we do not comment on that issue.

**B.     Referral to Separate and Independent Business Was Not Full and Equal Access Under the UCRA**

The trial court found that when Miller determined she was unable to design the cake, she immediately referred the Rodriguez-Del Rios to "another good bakery," but the couple declined her referral. The trial court then relied on *North Coast, supra*, 44 Cal.4th 1145 and *Minton v. Dignity Health* (2019) 39 Cal.App.5th 1155 (*Minton*) to conclude a refusal of service could satisfy the UCRA's "'full and equal access'" requirement when accompanied by an immediate referral to a different business entity that served comparable products. The court applied this interpretation of the UCRA's full and equal access requirement to the facts it found, and determined Miller's immediate referral to *Gimme Some Sugar* constituted full and equal access under the UCRA because that bakery was analogous to the proposed alternative facility in *Minton*. The CRD contends the trial court misinterpreted this case law, and it applied an incorrect rule of law to the facts.

### 1.     Standard of Review

In reviewing mixed questions of law and fact where we must determine whether the trial court properly applied the rule of law to the relevant facts, the review is conducted independently when the question is predominantly legal. (See *Haworth, supra*, 50 Cal.4th at p. 384.) Here, because the "'inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently.'" (*20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 271.)

### 2.     Analysis

The trial court's conclusion that defendants provided the Rodriguez-Del Rios full and equal access through a referral to another bakery was predicated on its interpretation of *North Coast* and *Minton*, and so we begin with a brief overview of those cases.

25.

In *North Coast,* an unmarried lesbian woman (Benitez) was denied intrauterine insemination (IUI) by physicians who had religious objection to performing the procedure on Benitez. (*North Coast, supra*, 44 Cal.4th at pp. 1150–1152.) She was ultimately referred to a physician outside North Coast's medical practice, and then filed suit against North Coast and its physicians, seeking damages and injunctive relief for, inter alia, sexual orientation discrimination in violation of the UCRA. (*North Coast, supra*, at p. 1152.) Among their affirmative defenses, the defendants asserted the alleged misconduct, if any, was protected by the right of free speech and the freedom of religion under both the federal and state Constitutions. (*North Coast, supra*, at pp. 1152–1153.)

Benitez moved for summary adjudication of that specific affirmative defense, which the trial court granted, ruling that neither the federal nor the state Constitutions provide a religious defense to a claim of sexual orientation discrimination under the UCRA. (*North Coast, supra*, 44 Cal.4th at p. 1153.) In granting the defendant physicians' writ petition, the Court of Appeal concluded summary adjudication was improper as to the physicians because it effectively precluded them from presenting evidence that they refused to perform the IUI for Benitez due to her unmarried status, as marital status was not an expressly protected characteristic at the time of the refusal. (*Ibid*.)

The Supreme Court agreed with the trial court that the federal Constitution's First Amendment right to the free exercise of religion did not exempt the defendant physicians in the case before it "from conforming their conduct to the [UCRA's] antidiscrimination requirements even if compliance poses an incidental conflict with [the] defendants' religious beliefs. (*North Coast, supra*, 44 Cal.4th. at p. 1156, citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah* (1993) 508 U.S. 520, 531 (*Lukumi*); accord, *Employment Div. Ore. Dept. of Human Res. v. Smith* (1990) 494 U.S. 872, 879 (*Smith*).) Moreover, "'[f]or purposes of the free speech clause, simple obedience to a law that does not require one to convey a verbal or symbolic message cannot reasonably be seen as a statement of support

for the law or its purpose. Such a rule would, in effect, permit each individual to choose which laws he would obey merely by declaring his agreement or opposition.'" (*North Coast, supra*, at p. 1157, quoting *Catholic Charities of Sacramento, Inc. v. Superior Court* (2004) 32 Cal.4th 527, 558–559 (*Catholic Charities*).) In turning to the California Constitution's free exercise guarantee (Cal. Const., art. I, § 4), the court assumed the physicians' religious exercise had been substantially burdened, further assumed strict scrutiny applied and concluded it was satisfied because the UCRA "furthers California's compelling interest in ensuring full and equal access to medical treatment irrespective of sexual orientation, and there are no less restrictive means for the state to achieve that goal." (*North Coast, supra*, at p. 1158.)

After reaching this conclusion, the court observed that to avoid any conflict between their religious beliefs and the UCRA, the defendant physicians could "simply refuse to perform the IUI medical procedure at issue here for any patient of North Coast, the physician's employer. Or because they incur liability under the [UCRA] if they infringe upon the right to the 'full and equal' services of North Coast's medical practice [citations], defendant physicians can avoid such a conflict by ensuring that every patient requiring IUI services receives 'full and equal' access to that medical procedure through a North Coast physician lacking defendants' religious objections." (*North Coast, supra*, 44 Cal.4th at p. 1159.)

The high court held the trial court's grant of summary adjudication correctly narrowed the issues in the case by disposing of the defendant physicians' contention that their constitutional rights to free speech and the free exercise of religion exempted them from complying with the UCRA's prohibition against sexual orientation discrimination while still leaving them free to offer evidence that their religious objections stemmed from Benitez's unmarried status. (*North Coast, supra*, 44 Cal.4th at p. 1161.)

In *Minton*, the plaintiff (Minton) was a transgender man diagnosed with gender dysphoria. (*Minton, supra*, 39 Cal.App.5th at p. 1158.) To treat the gender dysphoria,

27.

Minton's physician and two mental health professionals considered a hysterectomy medically necessary, and his physician scheduled the surgery at Mercy San Juan Medical Center (Mercy), a hospital owned and operated by Dignity Health. (*Id.* at p. 1159.) After the surgery was scheduled, Mercy's president notified Minton's physician the procedure had been cancelled and that she would "'never'" be allowed to perform the scheduled hysterectomy because it was a course of treatment for gender dysphoria as opposed to any other medical diagnosis. (*Ibid.*) Subsequently, the president suggested the physician obtain emergency admitting privileges at Methodist Hospital, a non-Catholic Dignity Health hospital about 30 minutes from Mercy. (*Id.* at pp. 1159, 1164.) The physician was able to secure the privileges and performed the hysterectomy three days after the surgery had originally been scheduled. (*Id.* at p. 1159.)

Minton filed suit, alleging a violation of the UCRA for discrimination based on his gender identity. (*Minton, supra*, 39 Cal.App.5th at p. 1158.) The trial court sustained Dignity Health's demurrer to an amended complaint, concluding Minton had failed to allege facts showing Dignity Health's conduct violated the UCRA. (*Minton, supra*, at p. 1159.) The trial court cited *North Coast* and reasoned it was not reasonably possible Minton could allege that his receiving the procedure he desired from the physician he selected to perform it three days later than planned at a different hospital than he desired deprived him of full and equal access to the procedure. (*Minton, supra*, at p. 1161.)

The Court of Appeal reversed. (*Minton, supra*, 39 Cal.App.5th. at p. 1163.) The court pointed out Minton had *not* alleged that providing him with access to alternative hospital facilities violated the UCRA; rather, his complaint was that Dignity Health violated the UCRA when it cancelled the procedure and told his doctor she would never be allowed to perform the hysterectomy. (*Minton, supra*, at p. 1164.) That refusal, the appellate court noted, was not "accompanied by advice that the procedure could instead be performed at a different nearby Dignity Health hospital." (*Ibid.*) The court reasoned that when Minton's surgery was cancelled, he was subjected to discrimination. (*Ibid.*)

28.

"Dignity Health's subsequent reactive offer to arrange treatment elsewhere was not the implementation of a policy to provide full and equal care to all persons at comparable facilities not subject to the same religious restrictions that applied at Mercy." (*Id.* at p. 1165.)

On examination of these cases, neither *North Coast* nor *Minton* support the trial court's conclusion that full and equal access under the UCRA can be accomplished by referral to a separate and independent business entity. We, like *Minton*, do not question *North Coast*'s observation that "ensuring" a patient full access to medical treatment through an alternative physician *at the same hospital* could constitute full and equal service. (*North Coast, supra*, 44 Cal.4th at p. 1159.) But *North Coast* never suggested that full and equal access under the UCRA could be satisfied by simply identifying for the patient an independent hospital that would offer comparable treatment. Indeed, the full and equal access to which the high court referred was the right to the "'full and equal' access to that medical procedure through a *North Coast* physician .…" (*North Coast, supra*, at p. 1159, italics added.)

Nor did *Minton* extend *North Coast* in such a manner. First, the issue addressed in *Minton* was *not* whether Dignity Health's "subsequent reactive offer to arrange treatment" at a different hospital constituted full and equal access under the UCRA. (*Minton, supra*, 39 Cal.App.5th at p. 1165.) *Minton* expressly limited its holding to "narrower grounds": "Without determining the right of Dignity Health to provide its services in such cases at alternative facilities, as it claims to have done here, we agree that [the] plaintiff's complaint alleges that Dignity Health initially failed to do so and that its subsequent rectification of its denial, while likely mitigating [Minton's] damages, did not extinguish his cause of action for discrimination in violation of the [UCRA]." (*Id.* at p. 1158.) It is axiomatic that an opinion is not authority for a proposition not considered, and the scope of "[l]anguage used in any opinion [must] be understood in the light of the facts and issues then before the court .…" (*Ginns v. Savage* (1964) 61 Cal.2d 520, 524,

29.

fn. 2; see *California Building Industry Assn. v. State Water Resources Control Bd.* (2018) 4 Cal.5th 1032, 1043.) We cannot agree that reliance on *Minton* to determine whether Miller's referral fulfilled the UCRA's full and equal access requirement is appropriate.

Second, even if *Minton* could be read to suggest in dicta that Dignity Health's alternative treatment proposal at a different hospital could have constituted full and equal access under the UCRA had it been timely offered, it was contemplating a related hospital facility *also* owned and operated by Dignity Health. (*Minton, supra*, 39 Cal.App.5th at p. 1160.) Moreover, it was a facility where Minton's chosen physician could obtain emergency admitting privileges, and where the time-sensitive procedure was performed only three days later than originally scheduled by Minton's physician. Not only did *Minton* expressly decline to address whether and what type of hospital alternative would constitute full and equal access, any suggestion the alternative would have sufficed if timely offered is necessarily cabined to the specific facts alleged, which bear no similarity to Miller's referral here.

The record reflects Miller had confirmed with *Gimme Some Sugar* at some point prior to the events in this case that it would provide wedding cake products and services to same-sex couples whom Miller referred, but there is no evidence a referral under that agreement would ensure the Rodriguez-Del Rios a wedding cake on the needed date, let alone the wedding cake they wanted to order from Tastries. It is irrelevant the trial court found the referral bakery to be a "comparable, good bakery." Merely identifying a separate bakery that is willing, in the abstract, to provide a wedding cake for same-sex couples says nothing about its ability to ensure a "comparable" wedding cake in terms of taste, design, cost or date availability. Indeed, testimony established the Rodriguez-Del Rios had already rejected *Gimme Some Sugar*'s cakes as overly sweet before they met with Miller.[11]

---

[11] It is irrelevant that Miller would have referred the Rodriguez-Del Rios to yet another bakery had the couple informed her they did not want a cake from *Gimme Some Sugar*. The

Discriminatorily denying service and then telling would-be customers they may take their business down the street (or farther) to a separate, unassociated establishment where they may be served by way of referral in no way ensures full and equal access to the product or service at the same price and under the same conditions. Miller's successful referral of another same-sex couple to *Gimme Some Sugar* in the past does not change this reality. Moreover, a referral to a separate and independent business subjects the customer to "'the deprivation of personal dignity that surely accompanies denials of equal access to public establishments'" that public accommodation laws like the UCRA are generally designed to address. (*Atlanta Motel v. United States* (1964) 379 U.S. 241, 250; see *Roberts v. United States Jaycees* (1984) 468 U.S. 609, 625.)

An analogous application of *North Coast*'s observation as to an UCRA-compliant alternative might exist if Miller herself, as an employee of Tastries, declined to do any work on the cake and turned the project over to another Tastries employee, ensuring continuity of service and price with access to the same product. But extending *North Coast* to encompass Miller's referral to a wholly separate and independent business is not only an unrecognizable distortion of the alternative *North Coast* articulated, it fundamentally undermines the UCRA's purpose to stand "as a bulwark protecting each person's inherent right to 'full and equal' access to 'all business establishments.'" (*Angelucci, supra*, 41 Cal.4th at p. 167.) There is no evidence Miller's referral to *Gimme Some Sugar* involved anything more than ascertaining ahead of time this bakery was willing to provide service for same-sex weddings Miller would not serve—nothing showed an agreement that *Gimme Some Sugar* necessarily would or could provide the specific cake (by taste and design) desired, on the date needed, for the price Tastries offered.

---

same issues of ensuring full and equal service access with a referral to any other separate business entity.

31.

As a practical matter, this referral is indistinguishable from hanging a sign in Tastries's window saying *no cakes for same-sex weddings provided here—try Gimme Some Sugar; we have confirmed it has no objection to providing service.* Under a referral practice like this, any business establishment would be authorized to refuse goods or services to customers based on any type of protected characteristic so long as they could point to a separate business confirmed to be theoretically willing to provide what the referring business subjectively considers to be similar goods or services. Embracing such a referral model would invite and endorse an untold number of discriminatory practices wholly antithetical to the UCRA's purpose (*White, supra*, 7 Cal.5th at p. 1025), effectively repealing the UCRA by judicial fiat. Whatever alternative offer of service might otherwise comport with the UCRA as articulated in *North Coast*, Miller's referral to a separate and independent business did *not* ensure full and equal access to *defendants'* goods and services, and we emphatically reject it as compliance with the UCRA.[12]

### C.     The UCRA Provides No Exemption for Disparate Treatment on the Basis of Sexual Orientation

Defendants also argue, alternatively, that Miller's conduct is exempt from the UCRA for constitutional and public policy reasons.

Defendants maintain Miller's conduct comes within section 51, subdivision (c), which provides that section 51 "shall not be construed to confer any right or privilege on a person that is conditioned or limited by law .…" According to defendants, because they maintain that compelling them to provide certain services to same-sex couples would violate their rights under the federal and state Constitutions, the UCRA is not applicable

---

[12]     Defendants assert that an unbounded right to refer customers to other businesses under the UCRA *must* be afforded to those with conflicting religious beliefs to avoid a clash with First Amendment rights. But that begs the primary question of whether a refusal on religious grounds is a constitutionally protected activity that overrides a public accommodations law. That cannot be answered in the abstract, but must be instead considered in the context of the particular constitutional right asserted, subject to the applicable analytical framework. We take up defendants' constitutional defenses *post*.

pursuant to section 51, subdivision (c). The First Amendment constitutes an affirmative defense to the UCRA on which defendants carry the burden of proof. (See generally Gaab & Reese, Cal. Practice Guide: Civil Procedure Before Trial, Claims and Defenses (The Rutter Group 2024) ch. 14(III)-C) ¶ 14:840.) Defendants' constitutional defenses must be considered separately; section 51, subdivision (c), does not operate as an exemption feature for First Amendment defenses. (See *Pines v. Tomson* (1984) 160 Cal.App.3d 370, 387 [whether First Amend. warrants an exclusion from the UCRA addressed separately and not as an exemption].)

Defendants next contend Miller's conduct comes within a public policy exception to the UCRA for distinctions that are nonarbitrary because the distinction made here was based on Miller's sincerely held religious beliefs. Some disparities in treatment have been recognized by decisional authority as reasonable under the UCRA because they are supported by compelling societal interests. (See, e.g., *Koire, supra*, 40 Cal.3d at pp. 36–38 [observing price discounts for children and elderly are supported by social policy considerations evidenced in legislative enactments that address special needs of these populations]; *Starkman v. Mann Theatres Corp.* (1991) 227 Cal.App.3d 1491, 1499–1500 (*Starkman*) [theater discounts for children and seniors help seniors and children participate in events that might not be affordable otherwise]; *Sargoy v. Resolution Trust Corp.* (1992) 8 Cal.App.4th 1039, 1046 (*Sargoy*) [higher deposit interest rates for seniors supported by public policy of assisting senior citizens]; *Sunrise Country Club Assn. v. Proud* (1987) 190 Cal.App.3d 377, 382 (*Proud*) [setting aside 10 swimming pools out of at least 21 for adults only was reasonable distinction based on danger to children in adult areas and adult areas largely populated by retired or semi-retired adults].)

However, the decisional authority recognizing lawful distinctions in treatment under the UCRA relate exclusively to unenumerated characteristics *or*, in a singular case, revolve around a distinction based on disability expressly recognized by the Legislature (*Chabner v. United of Omaha Life Ins. Co.* (9th Cir. 2000) 225 F.3d 1042, 1050 [Ins.

33.

Code, § 10144 expressly permits life insurance premium rate differential based on actuarial tables]), none of which include any distinction in treatment based on sexual orientation. Narrow distinctions based on age (an unenumerated category), for example, have been recognized as lawful only where compelling societal interests justify a difference in treatment, which are frequently evidenced by statute. (See *Koire, supra*, 40 Cal.3d at p. 38 [no strong public policy supported sex-based price discounts similar to those recognized on the basis of age].) Defendants point to no compelling societal interests that support a business establishment making a distinction in service based on sexual orientation. Rather, there is strong public policy favoring the elimination of distinctions based on sexual orientation with the UCRA being one such statute evidencing it. (See, e.g., Gov. Code, § 12920 [barring sexual orientation discrimination in employment]; *id.*, § 12955, subd. (a) [barring sexual orientation discrimination in housing]; *id.,* § 11135, subd. (a) [barring sexual orientation discrimination in programs operated by, or that are receiving financial assistance from, the state].)

Defendants assert that public policy "counsels against categorizing a good faith religious belief held by millions of Americans as invidious discrimination, particularly where, as here, Miller's policy applies to all customers regardless of sexual orientation." But this contention misapprehends the UCRA. First, Miller's policy, as already explained, does *not* apply equally to all because the policy refuses service based on an "intended purpose" that is inextricably rooted in sexual orientation and refuses certain services for certain people on that basis.

Second, it is the distinction that is legally arbitrary and unreasonable under the UCRA, not Miller's sincerely held religious beliefs. (*Koire, supra*, 40 Cal.3d at p. 32 [gender-based pricing distinction itself was unreasonable and arbitrary, not the rational self-interested profit motive spurring its creation]; cf. *Marina Point, supra*, 30 Cal.3d at pp. 740–741, fn. 9 [disapproving as overbroad the proposition that discriminatory policy is not actionable under the UCRA if it proceeds from a motive of rational self-interest and

34.

noting "an entrepreneur may find it economically advantageous to exclude all homosexuals, or alternatively all nonhomosexuals, from his restaurant or hotel, but such a 'rational' economic motive would not, of course, validate the practice"].)  When public policy objectives are judicially recognized as justifying certain distinctions (almost exclusively in unenumerated protected characteristics, like age), it is the compelling societal interest the distinction itself serves that is evaluated, not the underlying rationale for drawing the distinction.

### D. Conclusion

Because we conclude defendants' design standard regarding wedding cakes is facially discriminatory, the trial court's reliance on the absence of malice or ill will in determining the CRD had not proven intentional discrimination was irrelevant and reflected a misapplication of the intentionality requirement.  Further, we conclude the UCRA's full and equal access requirement is not satisfied by the referral to a separate business.  Finally, there is no compelling societal interest that supports making a distinction based on sexual orientation as reasonable or nonarbitrary under the UCRA.  As a result, the trial court's conclusions regarding the UCRA claim cannot be sustained.

In light of this conclusion, we turn next to consider defendants' affirmative free speech and free exercise defenses.  Even though the trial court erred in assessing the CRD's UCRA claim, those errors are prejudicial only if defendants' affirmative defenses provide no shelter from the UCRA's application.[13]  (Cal. Const., art. VI, § 13; *F.P. v. Monier* (2017) 3 Cal.5th 1099, 1108 [observing Const. "generally 'prohibits a reviewing court from setting aside a judgment due to trial court error unless it finds the error prejudicial'"].)

---

[13]    The trial court did not reach the element of harm, having concluded there was no intentional discrimination or failure to ensure full and equal access under the UCRA, but we note there is evidence to support a finding of harm as a result of the denial.

## II.     First Amendment's Free Speech Guarantee

Although finding no violation of the UCRA, the trial court reached defendants' affirmative defenses, including their First Amendment free speech defense under the federal Constitution, rooted in the compelled speech doctrine.  The trial court determined that defendants' preparation and sale of wedding cakes constitute both "pure speech" and expressive conduct (symbolic speech) protected by the First Amendment, and that forcing defendants to provide *any* preordered wedding cake for a same-sex wedding under the UCRA would compel defendants to speak a message with which they disagree, in violation of the First Amendment.  The CRD challenges the trial court's conclusions.

### A.     Expression Protected by the First Amendment

The First Amendment to the federal Constitution, which applies to the states through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech." (U.S. Const., 1st Amend.)  While the First Amendment "literally forbids the abridgment only of 'speech,'" it has long been recognized "that its protection does not end at the spoken or written word."  (*Texas v. Johnson* (1989) 491 U.S. 397, 404 (*Johnson*).)

Although First Amendment speech protections extend "beyond written or spoken words as mediums of expression" (*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.* (1995) 515 U.S. 557, 569 (*Hurley*)), not all expression is treated equally (*Cressman v. Thompson* (10th Cir. 2015) 798 F.3d 938, 951 (*Cressman*); *Anderson v. City of Hermosa Beach* (9th Cir. 2010) 621 F.3d 1051, 1058 (*Anderson*)). "While 'pure speech' activities are rigorously protected regardless of meaning, symbolic speech or conduct must be 'sufficiently imbued with elements of communication[]' [(]*Spence* [*v. Washington* (1974)] 418 U.S. [405,] 409)], and is subject to a 'relaxed constitutional standard[]' [citations]."[14]  (*Cressman, supra*, at pp. 951–952; see *Johnson,*

---

[14]     Although *recognizing* there is a distinction between what is sometimes labeled *pure speech* and symbolic speech (expressive conduct) can be articulated plainly enough, it is much more difficult to draw clean and clear lines around activities entitled to protection as "'pure

36.

*supra*, 491 U.S. at p. 406 ["The government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word."]; *Anderson, supra*, at p. 1059, fn. omitted ["Restrictions on protected expressive conduct are analyzed under the four-part test announced in *O'Brien*,[15] a less stringent test than those established for regulations of pure speech."].)[16]

The United States Supreme Court has recognized a range of different forms of entertainment and visual expression as constituting pure speech, including fiction (see *Hurley, supra*, 515 U.S. at p. 569); music without words (*Ward v. Rock Against Racism* (1989) 491 U.S. 781, 790); theater (*Schacht v. United States* (1970) 398 U.S. 58, 61–63); movies (*Joseph Burstyn, Inc. v. Wilson* (1952) 343 U.S. 495, 501–502); and "pictures, … paintings, drawings, and engravings" (*Kaplan v. California* (1973) 413 U.S. 115, 119).

---

speech'" as separate from expressive conduct sufficiently "'imbued with elements of communication'" such that it is protected as speech under the First Amendment as separate from conduct, though perhaps expressive, which receives no speech protection at all. (See, e.g., James M. McGoldrick, Jr., *Symbolic Speech: A Message from Mind to Mind* (2008) 61 Okla. L.Rev. 1, 2–5 (McGoldrick) [noting prefatorily the difficulty of navigating among these distinctions].)

We note that the difference in the treatment of pure speech and symbolic speech is tied to whether the law at issue is content-neutral or content-based and the state interests that are weighed. (See McGoldrick, *supra*, 61 Okla. L.Rev. at p. 25 [positing that "[i]f something is speech, then the level of protection will depend on whether the law is content-based or content-neutral, not the speech itself and not whether it is pure speech or symbolic speech"]; *City of Erie v. Pap's A.M.* (2000) 529 U.S. 277, 299, italics added ["As we have said, *so long as the regulation is unrelated to the suppression of expression*, '[t]he government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word.'"].)

**15** *United States v. O'Brien* (1968) 391 U.S. 367, 376–377 (*O'Brien*).

**16** The test articulated in *O'Brien* for symbolic speech is as follows: "This Court has held that when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.… [W]e think it clear that a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." (*O'Brien, supra*, 391 U.S. at pp. 376–377, fns. omitted.)

(See *303 Creative, LLC v. Elenis* (2023) 600 U.S. 570, 587 (*303 Creative*); *Cressman, supra*, 798 F.3d at p. 952; *Anderson, supra*, 621 F.3d at p. 1060.)

The federal circuit Courts of Appeals have additionally recognized tattoos (*Anderson, supra*, 621 F.3d at p. 1061); the sale of original artwork (*White v. City of Sparks* (9th Cir. 2007) 500 F.3d 953, 955); custom-painted clothing (*Mastrovincenzo v. City of New York* (2d Cir. 2006) 435 F.3d 78, 96–97 (*Mastrovincenzo*); and stained glass windows (*Piarowski v. Illinois Community College* (7th Cir. 1985) 759 F.2d 625, 628) as forms of pure speech (*Cressman, supra*, 798 F.3d at p. 952).

The justification for protecting these different forms of entertainment and visual expression is "'simply … their expressive character, which falls within a spectrum of protected "speech" extending outward from the core of overtly political declarations.'" (*Cressman, supra*, 798 F.3d at p. 952, quoting *National Endowment for the Arts v. Finley* (1998) 524 U.S. 569, 602–603 (dis. opn. of Souter, J.) (*Finley*).) The 10th Circuit Court of Appeals has described self-expression as "the animating principle behind pure speech protection …." (*Cressman, supra*, at pp. 952–953; see *Brush & Nib Studio, LC v. City of Phoenix* (2019) 247 Ariz. 269, 285 (*Brush & Nib*) ["words, pictures, paintings, and films qualify as pure speech when they are used by a person as a means of self-expression"]; *White v. City of Sparks, supra*, 500 F.3d at p. 956, fn. omitted ["So long as it is an artist's self-expression, a painting will be protected under the First Amendment, because it expresses the artist's perspective."].)

The high court has also afforded First Amendment protection to expressive conduct that qualifies as symbolic speech. (*Clark v. Community for Creative Non-Violence* (1984) 468 U.S. 288, 304 (*Clark*), citing *Tinker v. Des Moines School Dist.* (1969) 393 U.S. 503 (*Tinker*) [black armband worn by students in public school as protest of hostilities in Vietnam]; *Brown v. Louisiana* (1966) 383 U.S. 131 [sit-in by Black students in Whites only library to protest segregation]; *Stromberg v. California* (1931) 283 U.S. 359 [flying red flag as gesture of support for communism]; *Spence v.*

*Washington* (1974) 418 U.S. 405,410–411 (*Spence*) [displaying a U.S. flag with a peace symbol attached to it].)

Not all conduct constitutes speech, and the nation's high court has rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." (*O'Brien, supra*, 391 U.S. at p. 376; see *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.* (2006) 547 U.S. 47, 65–66 (*FAIR*).) Thus, the First Amendment extends only to conduct that is "inherently expressive." (*FAIR, supra*, at p. 66; *Spence, supra*, 418 U.S. at p. 409 [to warrant 1st Amend. protection, activity must be "sufficiently imbued with elements of communication"].) To determine whether conduct is sufficiently expressive, it must have been intended to be communicative and, in context, would be reasonably understood by the viewer to be communicative. (*Spence, supra*, at pp, 410–411; *Johnson, supra*, 491 U.S. at p. 404.)[17]

### B.    Compelled Speech Doctrine

The First Amendment's free speech guarantee "includes both the right to speak freely and the right to refrain from speaking at all." (*Wooley v. Maynard* (1977) 430 U.S. 705, 714 (*Wooley*).) This basic precept underpins the compelled speech doctrine which was first articulated in *Board of Education v. Barnette* (1943) 319 U.S. 624 (*Barnette*). There, Jehovah's Witnesses sought to enjoin enforcement of compulsory flag salute laws applicable to students because the required salute and pledge of allegiance violated their religious beliefs. (*Id.* at p. 629.) The high court struck down the law under the First Amendment, holding the government could not compel any individual "by word and sign" (*Barnette, supra*, at p. 633) "to utter what is not in his mind" (*id.* at p. 634).

---

[17]    "[I]t is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. To hold otherwise would be to create a rule that all conduct is presumptively expressive." (*Clark, supra*, 468 U.S. at p. 293, fn. 5.)

Like uttering the pledge of allegiance in *Barnette*, the government is also prohibited from compelling an individual to *display* a prescribed government message. (*Wooley, supra*, 430 U.S. at p. 717.) In *Wooley*, New Hampshire vehicle license plates displayed the motto "'Live Free or Die,'" which George Maynard objected to on religious and political grounds and covered the motto with tape, violating state law. (*Id.* at pp. 707–708.) After being cited, Maynard sought and received injunctive and declaratory relief against enforcement of the state law. (*Id.* at p. 709.) On review, the Supreme Court held in Maynard's favor, explaining his claim, like in *Barnette*, forced an individual "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." (*Wooley, supra*, at p. 715.) The court observed the state had required Maynard to use his private property as a "'mobile billboard'" (*ibid.*) for the state's ideological message, and the state's interests did not outweigh an individual's First Amendment "right to avoid becoming a courier for such message." (*Wooley, supra*, at p. 717, fn. omitted.)

Expanding beyond *Barnette* and *Wooley*, the compelled speech doctrine is not limited to situations where an individual must personally speak or display a specific government message—it also limits the government's ability to compel one speaker to host or accommodate another nongovernment speaker's message. (*Hurley, supra*, 515 U.S. at p. 580; see *Miami Herald Publishing Co. v. Tornillo* (1974) 418 U.S. 241, 256–257 [Fla. right-of-reply statute violated newspaper editor's right to determine content of the newspaper]; *Pacific Gas & Elec. Co. v. Public Util. Comm'n* (1986) 475 U.S. 1, 20–21 [state agency cannot require utility company to include third party newsletter in its billing envelope].)

For example, in *Hurley*, the organizers of a St. Patrick's Day parade refused to admit to their parade a group of openly gay, lesbian and bisexual descendants of Irish immigrants (GLIB) who wished to march with their group's banner stating, "'Irish American Gay, Lesbian and Bisexual Group of Boston.'" (*Hurley, supra*, 515 U.S. at

p. 570.)  The high court determined the parade itself was inherently expressive activity, as was GLIB's participation.  (*Id.* at pp. 568–570.)  Compelling the organizers to host GLIB's message within their own inherently expressive activity "violate[d] the fundamental rule of protection under the First Amendment[] that a speaker has the autonomy to choose the content of his own message."  (*Id.* at p. 573.)  It was of no consequence that the eclectic variety of parade participants meant the parade had no narrow, succinctly articulable message, nor were parade organizers required to generate each featured item of communication within the parade.  (*Id.* at pp. 569–570.)

But, different from *Hurley*, where an activity is *not* inherently expressive, the government may compel nonexpressive conduct even if it imposes an incidental burden on speech.  In *FAIR,* law schools began restricting military recruiter's access to students at law school recruiting events in opposition to the government's policy on homosexuals in the military.  (*FAIR, supra*, 547 U.S. at p. 51.)  Congress responded by enacting the Solomon Amendment (10 U.S.C. § 983) (Solomon Amendment), which specified that if any part of an institution of higher education denied military recruiters equal access provided to other recruiters, the institution would lose certain federal funds.  (*FAIR, supra*, at p. 51.)  An association of law schools and law faculties challenged enforcement of the Solomon Amendment, arguing the law violated their First Amendment freedoms of speech and association by forcing law schools to decide whether to disseminate and accommodate a military recruiter's message or lose federal funding.  (*FAIR, supra*, at pp. 52–53.)

The high court concluded there was no compelled-speech violation because "the schools [were] not speaking when they host[ed] interviews and recruiting receptions," even though the law school generated emails and notices of the recruiters' presence on campus.  (*FAIR, supra*, 547 U.S. at p. 64.)  As for the expressive nature of the conduct in hosting the military at recruiting events, the court reasoned "[t]he expressive component of a law school's actions is not created by the conduct itself but by the speech that

accompanies it." (*Id.* at p. 66.) Prior to the Solomon Amendment, schools had expressed disagreement with the military by requiring recruiters to use undergraduate campuses, but these actions "were expressive only because the law schools accompanied their conduct with speech explaining it." (*FAIR, supra*, at p. 66.) "An observer who sees military recruiters interviewing away from the law school has no way of knowing whether the law school is expressing its disapproval of the military, all the law school's interview rooms are full, or the military recruiters decided for reasons of their own that they would rather interview someplace else." (*Ibid.*) The court viewed the need for explanatory speech as "strong evidence that the conduct at issue here [was] not so inherently expressive that it warrants protection" as symbolic speech. (*Ibid.*) In the court's view, the only expressive activity required of the law schools was posting and sending notices indicating logistical information about where the interviews would take place, which the court found only incidental to the Solomon Amendment's regulation of conduct and nothing like the compelled speech in *Barnette* or *Wooley.* (*FAIR, supra*, at pp. 61–62.)

Where there is speech or expressive conduct, however, the compelled-speech doctrine can preclude the government's enforcement of antidiscrimination laws in places of public accommodation. (*303 Creative, supra*, 600 U.S. at p. 594.) In *303 Creative*, a graphic designer (Smith) offered website design services through her business, and she planned to create wedding websites, but had religious objections to creating wedding websites for same-sex couples. (*Id.* at pp. 579–580.) Smith filed a pre-enforcement First Amendment challenge alleging she faced a credible threat that the State of Colorado would enforce its public accommodation law to compel her to create websites celebrating same-sex marriage, which she did not endorse. (*303 Creative, supra*, at p. 580.)

The pre-enforcement posture of the case meant it was litigated absent any facts about a particular denial of service. Instead, the parties stipulated that, among other things, "Smith's websites promise to contain 'images, words, symbols, and other modes of expression'"; "that every website will be her 'original, customized' creation"; she "will

create these websites to communicate ideas—namely to 'celebrate and promote the couple's wedding and unique love story' and to 'celebrat[e] and promot[e] what … Smith understands to be a true marriage." (*303 Creative, supra*, 600 U.S. at p. 587.)

The court agreed that Smith's websites constituted "'pure speech'" and indicated the parties' stipulations drove that conclusion. (*303 Creative, supra*, 600 U.S. at p. 587 [websites considered pure speech "is a conclusion that flows directly from the parties' stipulations"]; *id.* at p. 599 [acknowledging that determining what qualifies as expressive activity protected by the 1st Amend. may raise difficult questions, but Smith's websites presented no such complication because "[t]he parties have *stipulated* that … Smith seeks to engage in expressive activity"].)

In turning to examine Colorado's public accommodations law as applied to Smith, the court construed the law as compelling Smith's speech because if she offered wedding websites celebrating marriages she endorses, the state intended to force her to create custom websites celebrating marriages she did not. (*303 Creative, supra*, 600 U.S. at p. 588.) The court viewed Colorado's interest in applying its public accommodations law to Smith as "'excis[ing] certain ideas or viewpoints from the public dialogue'" and to "force someone [to] speak *its* preferred message[.]" (*Id.* at pp. 588, 597.) While the state had a compelling interest in combatting discrimination, the court held the state could not compel speech in a content-based manner to further that interest. (*Id.* at pp. 590–592.)

As these cases demonstrate, determining whether the government has impermissibly compelled speech begins with a threshold inquiry as to whether there is inherently expressive activity protected by the First Amendment to which the speaker objects. (*Cressman, supra*, 798 F.3d at p. 951 [to "make out a valid compelled-speech claim [or defense], a party must establish (1) speech; (2) to which he objects; [and] that is (3) compelled by some governmental action"].) If there is expression protected by the First Amendment, then a second inquiry examines what the law regulates and the government's interests in doing so, applying the requisite degree of scrutiny. (See, e.g.,

*Hurley, supra*, 515 U.S. at pp. 580–581 [no sufficient government interest identified to interfere with speech]; *O'Brien, supra*, 391 U.S. at p. 376 ["when 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms"]; *Turner Broadcasting System, Inc. v. FCC* (1994) 512 U.S. 622, 642 ["Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the [most exacting] scrutiny."]; *Reed v. Town of Gilbert* (2015) 576 U.S. 155, 163 ["Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."].)  We turn now to the first inquiry.

C.    **Analysis**

Miller testified she adheres to a religious principle that "God created man and woman in his likeness, and marriage was between a man and a woman."  Miller believes the Bible teaches "Marriage is between a man and a woman and is very, very sacred, and it's a sacrament.  And [Miller] can't be a part of something that is contrary to God .…"  To Miller, the message of a wedding cake that she means to convey is that "this is a marriage ordained by God between a man and a woman and we are here to celebrate that with you."  In her view, supplying a wedding cake for same-sex couples sends a message of endorsement for the wedding, and Tastries is part of the "[w]hole thing," which relates to any dessert product the couple chooses, not just the cake.  By providing a cake or other dessert products to a wedding, Miller testified that Tastries is putting a "stamp of approval" on the wedding.  Tastries is conveying a message that the wedding should be celebrated, or, for other events, that the person should be celebrated.  In Miller's view, by supplying any type of preordered cake, Tastries is participating in the wedding event.

The trial court determined defendants' wedding cakes are "<u>pure speech</u>" entitled to First Amendment protection because they are "designed and intended—genuinely and

44.

primarily—as an artistic expression of support for a man and a woman uniting in the 'sacrament' of marriage, and a collaboration with them in the celebration of their marriage. The wedding cake expresses support for the marriage. The wedding cake is an expression that the union *is* a 'marriage,' and *should* be celebrated."[18] In addition, the trial court concluded "defendants' participation in the design, creation, delivery and setting up of a wedding cake is *expressive conduct*, conveying a particular message of support for the marriage that is very likely to be understood by those who view it."

The CRD argues this cannot be true; the wedding cake Miller refused to sell to the Rodriguez-Del Rios here cannot be considered pure speech—it is unlike an original sculpture, painting, verse or music, and lacks any of the hallmarks or characteristics that courts have associated with self-expression. According to the CRD, it was a predesigned—not customized—plain, white cake with three tiers that was sold by Tastries for a variety of different events, not just weddings. It did not inherently convey anything about Miller's views on marriage; the only way the cake could have conveyed a message was based on the customer's choice in selecting it for their wedding. Moreover, the CRD argues, Miller's subjective intent to convey a message of support for heterosexual marriage is insufficient by itself to transform a routine commercial product into a work of self-expression, particularly where the product itself does not independently express that message. Nor was the preparation and delivery of the cake, the CRD argues, protected expressive conduct. The CRD contends Miller could not have intended to send any message about marriage through the design of the cake because the cake was sold for multiple events, not just weddings. Additionally, the CRD argues, no

---

[18]    Because the CRD's complaint sought an order requiring defendants to immediately cease and desist from selling to anyone any item they are unwilling to sell, on an equal basis, to members of any protected group, the trial court considered the expressive nature of defendants' preordered wedding cakes generally, not just the cake Miller refused to sell to the Rodriguez-Del Rios.

reasonable viewer would understand the cake's preparation and delivery to a same-sex wedding to convey any message about marriage, especially a message of the baker.

Defendants respond that Miller's design and creation of a custom wedding cake incorporates elements of pure speech as an original and customized creation, which is a symbol of the creator's understanding of marriage. According to defendants, wedding cakes inherently convey the meaning that a particular union is a marriage and that it should be celebrated, which is how the Rodriguez-Del Rios understood it—they ultimately featured a tiered symbolic Styrofoam cake with an edible top layer specifically for the traditional cake cutting ceremony. The preparation and delivery of the cake is also expressive conduct, defendants maintain, because Miller intends that all her cakes convey a message of support for the sacrament of marriage between one man and one woman. And, according to defendants, everyone who sees the cake in context understands it was commissioned to celebrate the new union.

### 1. Standard of Review

Ordinarily, in reviewing a judgment based upon a statement of decision following a bench trial, Courts of Appeal review questions of law de novo, while findings of fact are reviewed for substantial evidence. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) However, the trial court's determinations as to defendants' First Amendment defenses are subject to independent review. (*In re George T.* (2004) 33 Cal.4th 620, 632; accord, *People v. Peterson* (2023) 95 Cal.App.5th 1061, 1066.) We defer to the trial court's credibility determinations, but we must undertake an """"independent examination of the whole record"""" (*Hurley*[*, supra*,] 515 U.S. at pp. 567–568), including a review of the constitutionally relevant facts "'de novo, independently of any previous determinations made by the [trial] court"""" to determine whether defendants' refusal of service was entitled to First Amendment protection. (*In re George T., supra*, at p. 634; accord, *Veilleux v. National Broadcasting Co.* (1st Cir. 2000) 206 F.3d 92, 106; see *Smith v. Novato Unified School Dist.* (2007) 150 Cal.App.4th 1439, 1453.)

### 2.     No Pure Speech

Our initial task is to determine whether defendants were engaged in a purely expressive activity that constitutes speech entitled to full First Amendment protection without resort to the *Spence-Johnson* test applicable to expressive conduct.  (*Anderson, supra*, 621 F.3d at p. 1059 [describing analysis to determine whether tattooing is speech protected by the 1st Amend.].)  When it comes to expression qualifying as pure speech, "courts, on a case-by-case basis, must determine whether the 'disseminators of [an item] are genuinely and primarily engaged in … self-expression.'"  (*Cressman, supra*, 798 F.3d at p. 953, quoting *Mastrovincenzo, supra*, 435 F.3d at p. 91.)

Some products and services in the marketplace have been deemed to be pure forms of expression and treated as speech entitled to full First Amendment protection.  A tattoo and the process of tattooing, for example, have been held to be forms of pure expression:  "Tattoos are generally composed of words, realistic or abstract images, symbols, or a combination of these, all of which are forms of pure expression that are entitled to full First Amendment protection."  (*Anderson, supra*, 621 F.3d at p. 1061.)  They express a "countless variety of messages" (*ibid.*), and there is no functional purpose for a tattoo *except* as a mode of expressing *something* by the tattoo designer and the customer.

Similarly, the custom websites Smith wished to create in *303 Creative* were considered pure speech by the high court, although it did not define the term.  (*303 Creative, supra*, 600 U.S. at p. 587.)  The parties stipulated Smith's custom websites would contain images, words, symbols, and other modes of expression; that each one would be her original, customized creation; and she would create these websites to communicate ideas, specifically to celebrate and promote a couple's wedding and unique love story and to celebrate and promote what Smith understood to be a true marriage.  (*Ibid.*)

47.

The cake at issue here bears no indicia of self-expression similar to tattoos or the custom wedding websites described by stipulation in *303 Creative*. The requested cake had no writing, drawings, images, engravings, symbols or any other modes of expression displayed on it: it was a plain, three-tiered, white cake with "wispy" frosting and some flowers. The cake was considered a custom order because *all* preordered cakes are labeled "custom" by Tastries, regardless of the design of the cake, any consultation process with the customer, or the degree of autonomy or influence the baker has regarding the cake's aesthetic appearance. Other than flavoring and size, nothing about the predesigned cake was to be customized for the Rodriguez-Del Rios as a couple or for their wedding specifically, setting it worlds apart from the websites in *303 Creative* or tattoos considered in *Anderson*. (*303 Creative, supra*, 600 U.S. at pp. 587–588 [parties stipulated the websites and graphics are "'original, customized' creation[s]" and Smith would "produce a final story for each couple using her own words and her own 'original artwork'"].) Moreover, unlike the websites considered in *303 Creative*, testimony established this cake design was popularly requested and sold for several different occasions, including birthdays, baby showers and quinceaneras. Miller similarly testified the cake was suitable for different events beyond weddings. On its own, the cake was a generic, multi-purpose product primarily intended to be eaten.

Defendants argue the expressiveness Miller intends with a wedding cake cannot be severed from its surrounding context, which here was the cake's display as a centerpiece at a same-sex wedding celebration. While the inquiry into what constitutes speech is context-driven (*Cressman, supra*, 798 F.3d at p. 953; *303 Creative, supra,* 600 U.S. at p. 600, fn. 6), self-expression amounting to pure speech cannot derive its expressive quality solely because it is observed in a specific place—a painting's expressiveness is not contingent on whether it hangs in an art gallery, nor is a symphony's expressiveness contingent on which orchestra performs it (see *Finley, supra*, 542 U.S. at p. 602 (dis. opn. of Souter, J.) [protection for artistic works turns simply on their expressive nature]).

"Pure-speech treatment is only warranted for those [items] whose creation is itself an act of self-expression." (*Cressman, supra*, at p. 954.)

The act of providing a product to a wedding reception with the intent to send a message does not transform that product into pure speech if the product itself is not the self-expression of the vendor. If this were the case, a host of nonexpressive products or services provided for a same-sex wedding reception could be deemed to convey a message merely because they were provided for the event—e.g., flatware, chairs and linens, etc. Moreover, many standard products provided to a wedding reception are equally as visible as the cake and used *by the couple* in a symbolic manner—a portable dance floor where the couple has a first dance, the bridal bouquet that is tossed at the reception, the centerpieces for the tables, beautifully plated meals prepared by the caterer, and guest favors left at each place setting. The mere fact these products are prepared for and provided to a same-sex wedding in a routine economic transaction does not transform them into the self-expression of the vendor. (See *Brush & Nib, supra*, 247 Ariz. at p. 312 (dis. opn. of Bales, J. (Ret.)) ["expression of a wedding invitation, as 'perceived by spectators as part of the whole' is that of the marrying couple"]; cf. *FAIR, supra*, 547 U.S. at p. 65 ["Nothing about recruiting suggests that law schools agree with any speech by recruiters, and nothing in the Solomon Amendment restricts what the law schools may say about the military's policies."].)

Defendants maintain the cake itself was a symbol because it was a wedding cake that inherently expressed *the bakery's* message of celebration and conveyed endorsement of the marriage just as a parade is the inherent expression of its organizers. But this cake was a wedding cake *only* because the Rodriguez-Del Rios were going to use it that way—this cake design was sold for many different events. Moreover, the mere act of preparing and selling merchandise, even a wedding cake, is not the inherent self-expression *of the vendor* just because the vendor has knowledge of how the end user will utilize the product. It is the consumer's *use* of a multi-purpose cake like this that gives it any

49.

expressive meaning at all, not the baker's beliefs or intent which are not reflected in the cake itself. (Cf. *Moody v. NetChoice, LLC* (2024) 603 U.S. 707, 739 [144 S.Ct. 2388, *2406] [where a purported host of third party speech is not itself engaged in expression, there is little risk of misattribution of the message].) Defendants implicitly acknowledge this through the sale of Tastries's daily display-case cakes. Tastries does not restrict the sale of those cakes, and a same-sex couple could purchase a Tastries's daily display-case cake to photograph, cut and serve at their wedding celebration.[19]

Here, the finished product could have been deployed for any number of different purposes—the essence of a generic, multi-purpose commercial product that expresses nothing at all until it is used in a particular manner by the customer. If there is any fitting analogy to the parade in *Hurley*, it is the Rodriguez-Del Rios who are most like the parade organizers—it is their parade; defendants are like vendors who refuse to sell the parade organizers blank, colorful vinyl banners because they are a disfavored group. (*Brush & Nib, supra*, 247 Ariz. at p. 312 (dis. opn. of Bales, J. (Ret.)) ["To the extent a parade analogy is apt, … [t]he organizers would be the marrying couple and forcing them to include particular messages in their wedding would be more analogous to *Hurley*."].)

The trial court focused on what it perceived as the artistic element of Miller's wedding cakes as a medium for her own self-expression. The United States Supreme Court has been clear that the arts are protected forms of expression under the First Amendment (see, e.g., *Hurley, supra*, 515 U.S. at p. 569 [remarking that examples of painting, music, and poetry are "unquestionably shielded"]; *White v. City of Sparks, supra*, 500 F.3d at pp. 955–956 ["Supreme Court has been clear that the arts and

---

[19] At oral argument, defendants' counsel acknowledged cakes purchased out of the daily display case do not constitute protected expression. Yet, the couple would not be permitted under Tastries's design standards to *preorder* for a specific date the exact same display-case cake for their wedding on the ground it would be a "custom" wedding cake that expresses a prohibited message. It is impossible to reconcile how a *preordered* cake for a same-sex wedding is *necessarily* a symbol amounting to pure speech if the very same cake carried directly from Tastries's display case to a same-sex wedding celebration is not.

entertainment constitute protected forms of expression"]), but the fact that frequently produced items of merchandise have an artistic element does not automatically afford them First Amendment protection as speech. Any object has the potential to be art, but "[t]o say that the First Amendment protects the sale or dissemination of all objects ranging from 'totem poles,' [citation], to television sets does not take us far in trying to articulate or understand a jurisprudence of ordered liberty; indeed it would entirely drain the First Amendment of meaning." (*Mastrovincenzo, supra*, 435 F.3d at p. 92, fn. omitted; see *Cressman, supra*, 798 F.3d at pp. 952–953 ["Given the animating principle behind pure-speech protection—viz., safeguarding self expression—it is evident that all images are not categorically pure speech."].)

If that were the case, a vast array of merchandise with only incidental artistic elements would qualify for First Amendment protection, such as playing cards with a decorative design or T-shirts emblazoned with stars and stripes, both of which the Second Circuit Court of Appeals has suggested are insufficiently expressive to receive First Amendment protection. (*Mastrovincenzo, supra*, 435 F.3d at pp. 94–95, citing *People v. Saul* (N.Y. Crim.Ct. 2004) 776 N.Y.S.2d 189, 192–193 & *Mastrovincenzo v. City of New York* (S.D.N.Y. 2004) 313 F.Supp.2d 280, 288.)

Cakes of every type are a widely produced consumer product intended for all kinds of purposes; even three-tiered cakes virtually identical to the one the Rodriguez-Del Rios sought from defendants. Being asked to reproduce a facsimile from a popularly ordered predesign, as here, can hardly be deemed an act of self-expression by the baker/decorator. Nothing about the sale of this cake reflected the independent expressive choices of the baker/decorator—it was the Rodriguez-Del Rios who dictated the size, shape, color, flavor and, indeed, the very design of the cake. Even the pattern of the frosting was not Tastries's elective choice. Much of this is likely true of tattoos, which have been recognized by some courts as pure speech, but there is a significant difference

51.

that tilts away from a broad conclusion that all cakes made for a wedding are primarily created as the self-expression of the baker.

Unlike a tattoo (and perhaps other forms of art), cakes uniformly have a nonexpressive functional purpose: they are primarily a dessert meant to be eaten—even wedding cakes. That is why the size of cakes are often ordered based on how many guests a customer anticipates feeding—so much so, Miller's client packet indicates how many people each cake size feeds. Not coincidentally, Miller's design standards require that cakes taste as good as they look, and wedding cake customers are offered a tasting to select from an array of filling, cake and frosting flavors because the cake is meant to be enjoyed as food. Indeed, the Rodriguez-Del Rios rejected a different bakery because its cakes were too sweet for certain of their guests to eat.

To overtake the nonexpressive element of a cake such that its preparation and assembly could be considered an act of self-expression by the baker, the expressive elements would have to be significant and apparent. We can imagine cakes like that. But *this* cake was no different than a multitude of other predesigned, routinely generated and multi-purpose consumer products with primarily nonexpressive purposes—this one as a dessert to be eaten at a gathering of some sort. In terms of its artistic element, this cake is entirely indistinguishable from a charcuterie board, a fruit bouquet, or a cheese platter— all versatile items used for many different parties or occasions, aesthetically assembled for salability and meant to be consumed as their primary purpose, not as a vehicle for the self-expression of the designer/assembler.

To conclude this cake is primarily an act of artistic self-expression entitled to First Amendment protection is to hold that *any* product artfully designed and prepared to have an aesthetically pleasing appearance—e.g., catering displays, cars, homes, jewelry, quilts, shoes, clothing and handbags to name only a few—is protected speech. Not only would such an expansive conception of artistic self-expression drain the First Amendment of meaning, it would invite broad potential disruption to the stream of commerce, where the

52.

mere act of providing routine, artfully designed consumer products without any indicia or characteristics associated with speech would be transformed into the self-expression of their maker/designer. (See generally *303 Creative, supra*, 600 U.S. at p. 592 [public accommodation laws cannot be applied to compel speech].)

Although the design and appearance of a vast array of ordinary commercial goods involve elements of creativity and originality that could be subjectively viewed as artistic, drawing the contours of protected speech to include routinely produced, ordinary commercial products as the artistic self-expression of the designer is unworkably overbroad. The trial court's conclusion that all defendants' wedding cakes constitute pure speech proves too much. This predesigned, plain white cake without any indicia of a wedding and no writing, images, symbols, engravings, even though aesthetically appealing, did not have any qualities signaling its preparation was primarily a self-expressive act of the baker/decorator.

### 3.    Expressive Conduct

Even if an activity is not protected as pure speech, it may still come within the First Amendment's protection as symbolic speech. Although pure speech "is entitled to First Amendment protection unless it falls within one of the 'categories of speech … fully outside the protection of the First Amendment,' [citations], *conduct* intending to express an idea is constitutionally protected *only* if it is 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments ….'" (*Anderson, supra*, 621 F.3d at p. 1058, italics added.) Whether conduct is sufficiently communicative to warrant First Amendment protection was originally considered in *Spence.* There, a college student displayed from the window of his apartment an upside down United States flag with a peace symbol taped to each side. (*Spence, supra*, 418 U.S. at p. 406.) He was arrested and prosecuted under Washington's "'improper use'" of a flag statute. (*Ibid*.) The Supreme Court found the display "was a pointed expression of anguish … about the then-current domestic and foreign affairs of his government." (*Id.

at p. 410.)  As the conduct was "inten[ded] to convey a particularized message," and because "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it," it was conduct protected by the First Amendment.  (*Id.* at pp. 410–411.)

Spence was followed later by *Johnson*, where a demonstrator was prosecuted under a Texas law after he burned an American flag in front of the Dallas City Hall while the Republican National Convention was occurring.  (*Johnson, supra*, 491 U.S. at p. 399.)  The flag was burned as part of "a political demonstration that coincided with the convening of the Republican Party and its renomination of Ronald Reagan for President." (*Id.* at p. 406.)  Applying the two factors identified in *Spence*, the court concluded both were present because the "overtly political nature of th[e] conduct was both intentional and overwhelmingly apparent."  (*Ibid.*)[20]  Under the *Spence-Johnson* test, we consider whether preparing and delivering this cake for use at a same-sex wedding reception is conduct that amounted to symbolic speech.

### a.    Intent to Convey a Particularized Message

We begin with whether defendants intended to convey a particularized message of some sort by preparing and delivering the cake.  The trial court determined a "specific message is intended and understood by the presence of defendants' wedding cakes, and separately, by defendants' participation in the wedding cake process.  The Tastries wedding cake by itself, *and* the people who are observed in the bakery or the wedding venue designing, delivering, setting up, or cutting the wedding cake, are associated with

---

[20]    More recently, in *Hurley*, the Supreme Court seemed to suggest the particularized message requirement of the *Spence-Johnson* test is not necessarily a prerequisite to First Amendment protection for symbolic speech in commenting that "a narrow, succinctly articulable message is not a condition of constitutional protection .…" (*Hurley, supra*, 515 U.S. at p. 569.) After *Hurley*, however, the Supreme Court cited *Johnson* in support of its conclusion in *FAIR* that law schools' conduct in refusing to give interview space to military recruiters was not symbolic speech because the law schools' message was not "'overwhelmingly apparent'" to those who viewed it. (*FAIR, supra*, 547 U.S. at p. 66.)

support for the marriage." The trial court noted the design standards "leave *no* room to doubt that Miller intends a message," and "*all* of Miller's wedding cake designs are intended as an expression of support for the sacrament of 'marriage,' that is, the marriage of a man and a woman." Although, the court acknowledged, "[i]t is not a message that everyone may perceive, or accept."

We cannot agree that *all* of defendants' wedding cakes are intended as an expression of support for the sacrament of marriage between one man and one woman. Here, they could not have intended to send that particularized message *through the cake's design* because this predesigned cake was requested and sold for a variety of parties and gatherings; the cake itself communicated nothing about marriage generally, let alone that marriage constitutes a religious sacrament reserved only for couples made up of one man and one woman (hence its popularity for use at other types of events). Miller's personal intent to send such a message is evidenced by Tastries's design standards, but, as the CRD points out, the cake here bore no evidence of that intent; the cake conveyed no particular message about marriage at all, let alone Miller's intended message. (See *FAIR, supra*, 547 U.S. at p. 66 ["If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it."]; *O'Brien, supra*, 391 U.S. at p. 376 ["We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in [it] intends thereby to express an idea."].) The cake design itself was not customized for a wedding specifically—aside from the number of people meant to be fed by the cake, defendants did not need to know anything about the *nature* of the event to prepare and assemble the cake.

### b. Likelihood Message Would be Understood By Those Who View It

There is also little likelihood a viewer would understand the cake's sale and provision to a same-sex wedding conveyed any message about marriage generally or an endorsement and celebration of same-sex marriage in particular. First, the cake itself

55.

conveyed no particularized message about the nature of marriage being between one man and one woman, and virtually no one would have understood that message from viewing the cake, even displayed as a centerpiece at a wedding reception. It was a plain, white, three-tiered cake with flowers that was supplied to different types of events—an ordinary commercial good in every sense; the cake itself conveyed nothing in support or opposition of same-sex marriage or marriage at all. Regardless of whether a viewer saw the cake being prepared at the bakery or displayed at a same-sex wedding reception, such a viewer would be unlikely to understand that message or any message from the cake.[21]

Second, a viewer is unlikely to understand this cake's sale and delivery for a wedding reception to convey a message of celebration and endorsement of same-sex marriage. Any rational viewer knows that retailers and vendors who provide services and products for wedding receptions are engaged in a for-profit transaction; the viewer would have no reason to assume a vendor was conveying any message at all—especially through a multi-purpose product that bears no indicia it was customized for this specific wedding.[22] As explained in *FAIR,* the law schools' different treatment of military

---

[21]    While there was some testimony indicating the employee originally assisting the couple might come to the wedding as a guest and could serve the cake at the reception, the order form reflected a delivery time prior to the event's start time and Eileen testified they never intended for Tastries to be there during the reception or the wedding. We find no authority holding that delivery of a product to a wedding reception site prior to the event, which is all that was requested of Tastries in this case, necessarily constitutes participation in a wedding ceremony. (Cf. *Kaahumanu v. Hawaii* (9th Cir. 2012) 682 F.3d 789, 799 [wedding ceremonies are protected expression under the 1st Amend.].)

[22]    Had the order been cancelled at the last minute, the cake could have been provided without alteration to any number of different gatherings because it was a generic, multi-purpose design that did not signal to a viewer a message of the baker/decorator or that the baker/decorator was even aware of its intended use. Consider the plain, black armbands worn by students in *Tinker* meant to express a message of protest against the hostilities in Vietnam; no viewer would have considered the manufacturer's sale of the armband/material as conveying approval and endorsement of the students' use. (See generally *Tinker, supra*, 393 U.S. at pp. 504, 505.) The creation and sale of a routinely produced, multi-purpose consumer good containing no words or other indicia of expression is simply not understood by the buying and viewing public as the expressive conduct of the manufacturer.

recruiters did not express a message of disagreement with the military that a viewer would understand. (*FAIR, supra*, 547 U.S. at p. 66.) The court explained an observer who saw military recruiters interviewing away from law school campuses had no way of knowing whether the law school was expressing disapproval, all the law school rooms were full, or the recruiters decided for their own reasons they would interview away from the law school. (*Ibid*.) Similarly, here, a viewer would not know from the cake's appearance at a wedding reception that the baker was expressing a message of celebration and endorsement of the marriage, or merely providing a cake in an arm's-length, commercial transaction, especially when the design of the cake is not customized for a wedding generally or *this* wedding particularly. A reasonable viewer has no way of knowing the reasons supporting defendants' decision to serve or decline any customer, especially a generic product like this one that could have been (and was) used for many different events.

If the mere act of providing and/or delivering a predesigned product for use at a same-sex wedding conveys a message of celebration and endorsement for same-sex marriage, a baker could potentially refuse to sell any goods or any cakes for same-sex weddings as a protected form of expression; but this would be a denial of goods and services that likely goes "beyond any protected rights of a baker who offers goods and services to the general public …." (*Masterpiece, supra*, 584 U.S. at p. 632.) Expanded logically, this reasoning would extend to a whole range of routine products and services provided for a wedding or wedding reception, including those highly visible items like jewelry, makeup and hair design for the wedding party, table centerpieces, stemware and alcohol for a toast, and catering displays. This is tantamount to business establishments being "allowed to put up signs saying 'no goods or services will be sold if they will be used for gay marriages,' something that would impose a serious stigma on gay persons." (*Id.* at p. 634.) If mere product provision to a wedding is considered expressive conduct, then *all* wedding vendors could potentially claim their refusal to serve same-sex couples

57.

is a form of protected expression because they disapprove of same-sex marriage, or any *other* type of marriage involving those with protected characteristics they do not wish to serve.

### D.    Conclusion

Because we conclude the cake defendants refused to provide in this instance was not an expressive activity protected by the First Amendment, defendants' free speech defense fails.  A huge number of routinely produced goods in the stream of commerce are designed with attention to aesthetic details that may reflect the designer's sense of color, balance and perspective, and while those elements might be viewed as artistic features, they are primarily applied and intended for broad appeal and profitability—not as a medium for self-expression.  While a routinely produced and multi-purpose cake like the one here might be baked and decorated with skill and creativity, we cannot conclude it is inherently expressive.

We acknowledge that, in some circumstances, a wedding cake or select services like cake cutting at the wedding celebration may be expressive, and in those cases, First Amendment speech protections may apply.[23]  Indeed, *303 Creative* permits businesses engaged in pure speech to decline to provide their services for same-sex weddings under defined circumstances.  (*303 Creative, supra*, 600 U.S. at p. 596.)  In doing so, however, the high court emphasized that result flowed from the expressiveness of the wedding websites at issue—stipulated to be an expressive activity.  (*Id.* at pp. 597, 599.)  The preparation and delivery, prior to an event, of a nondescript, plain white cake with a multi-purpose design is not a protected form of expression, either as pure speech or as expressive conduct.  As such, we do not reach the second inquiry, which examines

---

[23]    In that regard, the scope of any injunctive remedy the CRD may be afforded must be considered accordingly.

whether the UCRA, as applied to the refusal here, impermissibly compels speech under the requisite standard of scrutiny.

## III.    Free Exercise Clause

Defendant's free exercise defense is based on both the federal and state Constitutions.  Defendants argue Miller's religious beliefs are protected views, and they prohibit her or her business from providing wedding cakes for same-sex weddings; applying the UCRA to force defendants to sell wedding cakes for same-sex weddings substantially burdens Miller's free exercise of her beliefs.  According to defendants, the UCRA is neither neutral nor generally applicable, and thus its burden on Miller's religious freedom is subject to review under the strict scrutiny standard that the UCRA cannot survive.

"The Free Exercise Clause of the First Amendment, applicable to the States under the Fourteenth Amendment, provides that 'Congress shall make no law … prohibiting the free exercise' of religion." (*Fulton v. Philadelphia* (2021) 593 U.S. 522, 532 (*Fulton*), quoting U.S. Const., 1st Amend.; accord, *Lukumi, supra*, 508 U.S. at p. 531.)  "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." (*Smith, supra*, 494 U.S. at pp. 877. 878–882.)  Nevertheless, *Smith* held that an individual's religious beliefs do not "excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." (*Id.* at pp. 878–879.)

Thus, laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the free exercise clause so long as they are neutral and generally applicable; rather, they are subject only to rational basis review.  (*Smith, supra*, 494 U.S. at pp. 878–882; accord, *Lukumi, supra*, 508 U.S. at p. 531 ["a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice"].)  If a law is *not* neutral and generally applicable, however, it is subject to strict scrutiny and survives

59.

only if it advances "'"interests of the highest order"'" and is "narrowly tailored in pursuit of those interests." (*Lukumi, supra*, at p. 546.)

Based on *Smith* and *Lukumi*, our Supreme Court held in *North Coast* that "a religious objector has *no federal constitutional right* to an exemption from a neutral and valid law of general applicability on the ground that compliance with that law is contrary to the objector's religious beliefs." (*North Coast, supra*, 44 Cal.4th at p. 1155.) *North Coast* then applied *Smith*'s test to the UCRA from which the defendant physicians sought a religious exemption. The court held the UCRA is "'a "valid and neutral law of general applicability"'" because, as relevant to the case before it, the UCRA "requires business establishments to provide 'full and equal accommodations, advantages, facilities, privileges, or services' to all persons notwithstanding their sexual orientation." (*North Coast, supra*, at p. 1156.) Accordingly, the court held, "the First Amendment's right to the free exercise of religion does not exempt [the] defendant physicians … from conforming their conduct to the [UCRA]'s antidiscrimination requirements even if compliance poses an incidental conflict with [the] defendants' religious beliefs." (*Ibid.*)

Turning to the California Constitution's free exercise clause (Cal. Const., art. 1, § 4), the court assumed without deciding that strict scrutiny was the applicable standard of review. Under that standard, "'a law could not be applied in a manner that substantially burden[s] a religious belief or practice unless the state show[s] that the law represent[s] the least restrictive means of achieving a compelling interest .…'" (*North Coast, supra*, 44 Cal.4th at p. 1158, quoting *Catholic Charities, supra*, 32 Cal.4th at p. 562.) The court concluded that even if compliance with the UCRA's prohibition against sexual orientation discrimination substantially burdened the defendant physicians' religious beliefs, that burden was "insufficient to allow them to engage in such discrimination" because the UCRA furthered "California's compelling interest in ensuring full and equal access to medical treatment irrespective of sexual orientation, and

60.

there [were] no less restrictive means for the state to achieve that goal." (*North Coast, supra*, at p. 1158.)

## A. Federal Constitutional Analysis

The trial court here concluded that, although application of the UCRA substantially burdens Miller's free exercise of her religion, *North Coast*'s conclusion that the UCRA survives strict scrutiny, even where the prohibition on sexual orientation substantially burdens religious rights, was binding. Relying on more recent United States Supreme Court opinions, defendants argue the UCRA is not a valid and neutral law of general applicability because it provides discretionary exemptions, and it treats secular activity more favorably than religious activity. (Code Civ. Proc., § 906.)[24]

### 1. Neutrality and General Applicability of the UCRA

Typically, the free exercise analysis begins by evaluating whether the law at issue is neutral and of general applicability. For a law to be generally applicable, it may not selectively "impose burdens only on conduct motivated by religious belief …." (See *Lukumi, supra*, 508 U.S. at p. 543.) A law is not generally applicable (1) where "it 'invites' the government to consider the particular reasons for a person's conduct by providing '"a mechanism for individualized exemptions"'" and (2) where it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." (*Fulton, supra*, 593 U.S. at pp. 533, 534.) A government policy is neutral if it does not "restrict[] practices because of their religious nature" or evince "intoleran[ce] of religious beliefs." (*Id.* at p. 533.) The neutrality analysis focuses on the purposes or motivation behind a policy, and requires examination

---

[24] Defendants are not an appealing party, but they may raise an issue of error in the context of ascertaining whether the CRD was prejudiced by the trial court's erroneous conclusions under the UCRA. In relevant part, Code of Civil Procedure section 906 provides as follows: "The respondent, or party in whose favor the judgment was given, may, without appealing from such judgment, request the reviewing court to and it may review … matters for the purpose of determining whether or not the appellant was prejudiced by the error or errors upon which he relies for reversal or modification of the judgment from which appeal is taken."

of policymakers' subjective intent; the general-applicability inquiry, on the other hand, "focuses on the objective sweep of a policy: whom it covers, whom it exempts, and how it makes that distinction." (*Spivack v. City of Philadelphia* (3d Cir. 2024) 109 F.4th 158, 167.)

Relying on *Fulton*, defendants argue the UCRA incorporates discretionary exceptions indicating it is *not* generally applicable. Defendants maintain that because the UCRA "asks courts to consider on a case-by-case basis whether a particular discriminatory act is 'reasonable,' it is the antithesis of general applicability .…'" Specifically, defendants point to a variety of cases that recognize certain judicially acknowledged public policy exceptions related to protected characteristics not expressly enumerated in the statute.

*Fulton* involved foster care agency Catholic Social Services (CSS) to whom Philadelphia had stopped referring children after discovering CSS would not certify same-sex couples to be foster parents due to its religious beliefs about marriage. (*Fulton, supra*, 593 U.S. at pp. 526–527.) When children could not remain in their homes, the city's human services department would assume custody of the children; the department would enter into standard annual contracts with private foster care agencies to place some of those children with foster families. (*Id.* at p. 529.) State-licensed foster agencies like CSS were given authority to certify foster families; when the department would seek to place a child, it would send agencies a request and the agencies would determine whether any of their certified families were available. (*Id.* at p. 530.) CSS believed that marriage is a sacred bond between a man and a woman, and it understood the certification of prospective foster families to be an endorsement of their relationship, and, to that end, it would not certify same-sex couples or unmarried couples. (*Ibid.*) The city concluded CSS's refusal to certify same-sex couples violated a nondiscrimination provision in its contract with the city and a separate nondiscrimination provision in a citywide ordinance.

(*Id.* at p. 531.)  The city refused to execute a full foster contract with CSS in the future unless the agency agreed to certify same-sex couples.  (*Ibid.*)

The high court determined the contract provision was not generally applicable under *Smith* because it incorporated individual exceptions permitting a provider to reject certain prospective or foster parents at the sole discretion of a city official.  (*Fulton, supra*, 593 U.S. at p. 535.)  Specifically, the contract stated that a "'[p]rovider shall not reject a child or family including, but not limited to, … prospective foster or adoptive parents, for Services based upon … their … sexual orientation … unless an exception is granted by the Commissioner or the Commissioner's designee, in his/her sole discretion.'"  (*Ibid.*)  "[T]he inclusion of a formal system of entirely discretionary exemptions in [the contract] render[ed] the contractual nondiscrimination requirement not generally applicable."  (*Id.* at p. 536.)  Further, the city's nondiscrimination ordinance did not apply to CSS's certification of a foster parent because CSS did not qualify as a public accommodation under the ordinance.  (*Id.* at pp. 539–540.)  Because the contractual nondiscrimination requirement imposed a burden on CSS's religious exercise and did not qualify as generally applicable, it was subject to the most rigorous of scrutiny requiring that it advance "'"interests of the highest order"'" and is narrowly tailored to achieve those means.  (*Id.* at p. 541.)  The question was not whether the city had a compelling interest in enforcing its nondiscrimination policies generally, but whether it had such an interest in denying an exception to CSS.  (*Ibid.*)  The court concluded the city's interests in maximizing the number of foster families and minimizing liability were not shown to be put at risk by granting an exception to CSS—excluding CSS would reduce the number of foster families, and the city offered only speculation that it might be sued over CSS's certification practices.  (*Id.* at pp. 541–542.)

Although clarifying *Smith* regarding what it means for a law or regulation to be "generally applicable" (see *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.* (9th Cir. 2023) 82 F.4th 664, 685), we conclude *Fulton* does not fatally

undercut *North Coast*, nor does it provide analogous support for defendants' assertions regarding the UCRA. First, *Fulton* did not overrule *Smith* and relied on it for the proposition a law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exceptions, regardless whether any exceptions have been given. (*Fulton, supra*, 593 U.S. at pp. 534–535, 537.) Second, *Fulton*'s ruling was framed around the city's "inclusion of a formal system" of discretionary exceptions. (*Id.* at p. 536; see *Tingley v. Ferguson* (9th Cir. 2022) 47 F.4th 1055, 1088 [holding a statute generally applicable in part because it lacked any provision providing a formal discretionary mechanism for individual exceptions].) Unlike the contractual nondiscrimination provision in *Fulton*, the UCRA contains no formal system for discretionary exemptions or any other system for obtaining individualized exemptions.

Defendants contend that, under the UCRA, courts are required to consider the circumstances underlying facially discriminatory policies and determine whether they are reasonable and supported by public policy. As such, defendants argue, discretionary exemptions are built into the statute. As explained *ante* in addressing defendants' public policy argument under the statute, the UCRA prohibits business establishments from discriminating on the basis of expressly articulated protected characteristics, but it has also been interpreted to prohibit discrimination based on categories that are not expressly identified in the statute where the disparate treatment is deemed "arbitrary, invidious or unreasonable …." (*Sargoy, supra*, 8 Cal.App.4th at p. 1043.) Within these unenumerated categories, California courts have concluded that some distinctions in treatment— particularly those that promote the welfare of children and seniors—are not arbitrary or unreasonable because they are based on public policy objectives, typically explicitly stated by the Legislature in statutory enactments, that are often very different from distinctions made with respect to expressly identified characteristics such as sex. (See *Koire, supra*, 40 Cal.3d at pp. 37–39.)

64.

For example, age is not an identified characteristic and differential price policies designed to benefit senior citizens and children have been held permissible. (See, e.g., *Pizarro v. Lamb's Players Theatre* (2006) 135 Cal.App.4th 1171, 1176 [discount theater tickets for "'baby-boomers'" to attend a musical]; *Starkman, supra*, 227 Cal.App.3d at pp. 1498–1499 [discounted theater admissions for children and seniors]; *Sargoy, supra*, 8 Cal.App.4th at pp. 1048–1049 [higher interest-earning rates for seniors].) Likewise, a distinction limiting children from swimming in certain pools of a condominium association was supported by safety concerns, among other things, and thus not unreasonable. (*Proud, supra*, 190 Cal.App.3d at p. 382.) Further, age distinctions made by car rental companies have been held nondiscriminatory under the UCRA because the Legislature has regulated vehicle rental agreements to specifically permit such restrictions. (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1503–1505 (*Lazar*).)

Parental status and motherhood are also unenumerated characteristics, and a tote bag giveaway for women over age 18 years to celebrate Mother's Day at a baseball game meant as a noncompensatory gift, not a discount on admission, was not unlawful discrimination. (*Cohn v. Corinthian Colleges, Inc.* (2008) 169 Cal.App.4th 523, 528–530.) Similarly, the California Supreme Court in *Koebke* examined various public policy considerations to determine whether drawing a distinction based on marital status—then an unenumerated characteristic—was arbitrary or unreasonable. (*Koebke, supra*, 36 Cal.4th at pp. 844–846.)

This decisional authority represents California courts' efforts to define the contours of what constitutes unreasonable, arbitrary or invidious discrimination under the UCRA in the context of unenumerated characteristics, and examine where bona fide public policy may justify a distinction. It does not constitute a formalized system of discretionary, individualized exemptions to the UCRA within the contemplation of *Fulton*. (*Emilee Carpenter, LLC v. James* (2d Cir. 2024) 107 F.4th 92, 110 (*Emilee Carpenter*) [challenged laws did not constitute a mechanism for individualized

65.

exemptions under *Fulton* because they did not "invite government officials to consider whether an individual's reasons for requesting an exemption are meritorious"]; see *Canaan Christian Church v. Montgomery County* (4th Cir. 2022) 29 F.4th 182, 203 (conc. opn. of Richardson, J.) (*Canaan Christian Church*) [noting the unconstrained discretion rule as articulated in *Fulton* relates to "unconstrained discretion to make essentially ad-hoc decisions about what circumstances warrant an exception"].)

Defendants argue the UCRA is not neutral or generally applicable under *Tandon v. Newsom* (2021) 593 U.S. 61 (*Tandon*) because it contains "'myriad exceptions'" that treat secular activity more favorably than religious activity. They point to "categorical exemptions" for specific housing reservations for senior citizens (§§ 51.2–51.4, 51.10–51.12) and "for all discriminatory distinctions that comply with other laws" (§ 51, subd. (c)).

In *Tandon*, the high court considered an application for injunctive relief pending appeal based on a free exercise challenge to the restriction on the size of in-home religious gatherings during the Covid-19 pandemic.[25] In a per curiam order, the high court observed that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." (*Tandon, supra*, 593 U.S. at p. 62.) "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." (*Ibid*.) In other words, courts are to look to the "asserted interests" of a rule and consider whether exempted secular conduct undermines those asserted interests in a similar way to religious conduct. (*Fulton, supra*, 593 U.S. at p. 534.) "If

---

[25]     California had permitted hair salons, retail stores, movie theaters, private suites at sporting events and concerts, and indoor restaurants to bring more than three households together under the restrictions, but it had not permitted the same for people who wanted to gather for at-home religious exercise. (*Tandon, supra*, 593 U.S. at p. 63.)

the government regulates religious activities while excepting secular activities for which its stated interest equally applies, then it unjustifiably belittles the religious practice." (*Cannan Christian Church, supra*, 29 F.4th at p. 204 (conc. opn. of Richardson, J.).)

Here, the UCRA does not draw any distinctions between secular and religious activities, and there is no evidence the UCRA was enacted as a means to discriminate against religion. Moreover, defendants' argument the statutory provisions relating to the preservation of housing for senior citizens (§§ 51.2–51.4, 51.10–51.12) are contradictory secular exemptions under the UCRA, rendering it not generally applicable, is unpersuasive. The UCRA expressly bars sexual orientation discrimination "in all business establishments of every kind whatsoever" (§ 51, subd. (b)), and the UCRA's "fundamental purpose" in doing so is to "secure to all persons equal access to public accommodations" no matter what their sexual orientation (*Harris, supra*, 52 Cal.3d at p. 1169). These senior housing sections do not represent a system of exemptions for comparable secular activities that undercuts or contradicts the UCRA's purpose with respect to ensuring full and equal access irrespective of sexual orientation. (*Emilee Carpenter, supra*, 107 F.4th at p. 111 [regarding New York public accommodation laws, under *Tandon*, "religious conduct that [the plaintiff] seeks to engage in is not 'comparable' to any sex-based discrimination justified by bona fide public policy reasons"; "limited public policy exemption for sex discrimination does not 'undermine[] the government's asserted interest[]' in prohibiting sexual orientation discrimination 'in a similar way'"].) Nor does the UCRA's statement that its scope is "not [to] be construed to confer any right or privilege on a person that is conditioned or limited by law" operate in such a manner. (§ 51, subd. (c).) The UCRA's scope provision merely provides guidance as to which law applies in the event of a conflict, and defendants point to no California law that permits disparate treatment on the basis of sexual orientation. (See *Lazar, supra*, 69 Cal.App.4th at p. 1504.) Nothing in defendants' arguments persuades us *North Coast*'s conclusions regarding the UCRA's general applicability and neutrality

67.

have been fatally undermined by *Fulton* or *Tandon*. (*North Coast, supra*, 44 Cal.4th at p. 1156; see *Correia v. NB Baker Electric, Inc.* (2019) 32 Cal.App.5th 602, 619 ["On federal questions, intermediate appellate courts in California must follow the decisions of the California Supreme Court, unless the United States Supreme Court has decided the *same* question differently."], citing *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### 2. The CRD's Neutrality

Defendants maintain the CRD violated its obligation under the free exercise clause to "proceed in a manner neutral toward and tolerant of [Miller's] religious beliefs." (*Masterpiece, supra*, 584 U.S. at p. 638.) The trial court concluded the CRD's administrative investigation and prosecution did not amount to hostility: "While [the CRD] may have stepped on the line at times, it did not commit a personal foul sufficient to constitute a [free exercise] defense in this case." Defendants argue this was error. Defendants assert the CRD has prosecuted the case for six years and has asserted there is no burden on Miller's religious exercise because she has options other than an outright refusal to make a wedding cake for a same-sex couple, which lacks sensitivity to and neutrality toward Miller's beliefs. Defendants also contend the CRD has made comments and statements like those the Colorado Civil Rights Commission made in *Masterpiece*, which the high court found hostile to the baker's religion or religious viewpoint. Finally, defendants contend the CRD has done nothing to address the "rampant, ongoing religious discrimination against Miller."

In *Masterpiece*, the court concluded that the Colorado Civil Rights Commission, the adjudicatory body deciding the case at the administrative level, made hostile comments that "cast doubt on the fairness and impartiality of the Commission's adjudication of [the cake baker] Phillips' case." (*Masterpiece, supra*, 584 U.S. at p. 636.) During public hearings, commissioners endorsed the view that religious beliefs cannot legitimately be carried into the public sphere or commercial domain, "implying that

religious beliefs and persons are less than fully welcome in Colorado's business community." (*Id.* at p. 634.) Although standing alone, the comments could have been construed to mean that a business cannot refuse to provide service based on sexual orientation, comments made at a separate meeting indicated these original comments were likely meant dismissively, showing a lack of consideration of the baker's free exercise rights. (*Id.* at p. 635.) Specifically, at a subsequent public meeting of the commission, a commissioner commented that religion had "'been used to justify all kinds of discrimination throughout history,'" including slavery and the holocaust, and commented that "'it is one of the most despicable pieces of rhetoric that people can use to—to use their religion to hurt others.'" (*Ibid.*) The Supreme Court found this sentiment to be "inappropriate for a Commission charged with the solemn responsibility of fair and neutral enforcement of Colorado's antidiscrimination law—a law that protects against discrimination on the basis of religion as well as sexual orientation." (*Id.* at pp. 635–636.) Taken together, the high court could not "avoid the conclusion that these statements cast doubt on the fairness and impartiality of the Commission's adjudication of [the baker's] case," leading to an inescapable inference that the baker's defenses were not considered with the neutrality the free exercise clause requires. (*Id.* at pp. 636, 639.)

The situation and the CRD's litigation statements are distinguishable from *Masterpiece*. The CRD is not an adjudicatory body. Under its statutory mandate as the state's civil rights enforcement agency, the CRD has brought a civil action on behalf of the real parties in interest and the public. (Gov. Code, § 12965, subd. (a)(1).) The CRD's role is not one of neutral decisionmaker, which is fundamentally different from that of the commission in *Masterpiece*. The CRD, as a party to litigation, is entitled to mount a zealous and forceful legal challenge. Most importantly, we find nothing in the CRD's conduct or litigation statements that presented anything amounting to hostility or comparable to that voiced by the commission members in *Masterpiece*.

Defendants' claim that the CRD gravely distorted Miller's sincerely held religious beliefs in public filings, and thus exhibited hostility, is without support. As an adversary in litigation, the CRD has consistently argued Miller's denial of any preordered cake for same-sex weddings constitutes discrimination on the basis of sexual orientation because it creates a distinction in service turning exclusively on the sexual orientation of the end users. That argument does not denigrate Miller's religious beliefs about marriage, question whether those beliefs are sincerely held, or insinuate that Miller's policy is a pretext for underlying malice or ill will toward those of nonheterosexual orientation.[26]

---

[26] Defendants construe statements in the CRD's filings as targeting Miller personally and her religious beliefs, but the record reflects the CRD took aim at Miller's *policy and conduct* in refusing any preordered cake for a same-sex wedding and argued it caused disparate treatment of a protected group. The CRD argued that policy harmed the dignity of all Californians because it relegates certain individuals to second-class status based on a protected characteristic. The CRD's argument is one of the central issues in the case, and these are points of good-faith legal disagreement among lawyers and judges across the country in the context of other public accommodations laws. (See, e.g., *303 Creative, supra*, 600 U.S. at p. 637 (dis. opn. of Sotomayor, J.) [commenting that the majority's decision allowing website designer to refuse websites for same-sex weddings gives "new license to discriminate" and the "immediate, symbolic effect of the decision is to mark gays and lesbians for second-class status"]; *Telescope Media Group v. Lucero* (8th Cir. 2019) 936 F.3d 740, 771 (conc. & dis. opn. of Kelly, J.) [while reason for differential treatment in supplying wedding videos to same-sex couples may not be because of prejudice against homosexuals, it does not make intended conduct any less discriminatory under the law]; *Brush & Nib, supra*, 247 Ariz. at p. 316 (dis. opn. of Bales, J. (Ret.)) [observing that beyond injury to particular customers who are denied goods or services, majority's approval of policy refusing custom wedding invitations to same-sex couples threatens to create a marketplace in which vendors can openly proclaim their refusal to sell to customers whom they disfavor, a prospect that "diminishes our defining statement that all are created equal"].)

Nor was the CRD acting with hostility against Miller or her religion in relying on race-discrimination decisional authority to argue its case—such precedent is undeniably part of the high court's constitutional jurisprudence, including in the context of public accommodation laws. It is pertinent to our understanding of the issues, how legal principles have been applied in different factual circumstances that may have important analogous value, and the consequences that flow from their application. (*303 Creative, supra*, 600 U.S. at pp. 619–623 (dis. opn. of Sotomayor, J.) [describing and comparing various exemptions sought from public accommodations laws in the "civil rights and women's liberation eras"].)

We, like the trial court, do not find any conduct by the CRD that rises to the level of hostility or non-neutrality, particularly in the context of adversarial litigation.

Finally, defendants argue the CRD has demonstrated hostility by treating Miller differently in failing to address "the rampant, ongoing religious discrimination against [her]." Miller asserts the CRD knew that many of her corporate clients had "dropped their contracts [with her] because of her beliefs," but the CRD did nothing. However, there is no evidence Miller filed an administrative complaint with the CRD that it failed to pursue. (See Gov. Code, § 12963 [investigation prompted by filing a complaint].) Defendants also argue Miller sustained a deluge of harassing phone calls and threats of violence, which defendants claim the CRD did nothing about.[27] But the CRD is not a criminal law enforcement agency and is without the necessary authority or jurisdiction to criminally prosecute acts of harassment or threats against Miller, her staff or the Rodriguez-Del Rios.[28] Even to the extent the CRD has the ability to provide resources or the authority to bring a civil action under the Ralph Civil Rights Act of 1976 (§ 51.7) for violence or threats of violence based on a protected characteristic, there is no evidence in

---

[27] We decline to address any evidence proffered on appeal that the trial court excluded at trial, including third party social media threats, vandalism, and violent conduct. Defendants make no argument this evidence was improperly excluded at trial, and we have no basis to conclude the trial court abused its discretion in doing so. (See *People v. Ashford University, LLC* (2024) 100 Cal.App.5th 485, 533, fn. 11; see also *Glassman v. Safeco Ins. Co. of America* (2023) 90 Cal.App.5th 1281, 1307 [documents not presented in the trial proceeding generally must be disregarded as beyond the scope of review].) Defendants' argument the CRD should have investigated Miller's lost corporate contracts was not supported by specific evidence presented at the bench trial. Miller's testimony was limited to the fact she lost corporate clients because of the refusal and the surrounding publicity, but this record contains nothing about those contracts or the circumstances of their nonrenewal. Nor does the record indicate a request or complaint made by Miller to the CRD seeking investigative or resource assistance that the CRD refused to provide, including under the Ralph Civil Rights Act of 1976 (§ 51.7).

[28] It is disheartening that certain non-party individuals viewed this legal dispute as an excuse to threaten or harass others, including Miller, her staff and the Rodriguez-Del Rios. Such conduct has no place in our society, and we condemn it in the strongest possible terms.

71.

the record defendants filed any complaint with the CRD, or that they asked the CRD to provide resources or investigate any third party conduct.

### 3. California's Free Exercise Guarantee

Finally, California's Constitution includes a free exercise guarantee: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed." (Cal. Const., art. I, § 4.)

The trial court determined that the application of the UCRA in this case substantially burdens Miller's free exercise of her Christian faith. The trial court also determined the UCRA's application here could not satisfy strict scrutiny because there was a less restrictive means to achieve the state's goal of ensuring full and equal access to goods provided by public facing business establishments irrespective of sexual orientation—a referral to another comparable business. Nonetheless, the trial court concluded it was bound by *North Coast*'s conclusion that the UCRA survives strict scrutiny.

Although declining to determine what standard of review would apply to the California's Constitution's guarantee of free exercise of religion, the California Supreme Court concluded in *North Coast* that the UCRA is a valid and neutral law of general applicability. (*North Coast, supra*, 44 Cal.4th at pp. 1156, 1158.) Assuming the UCRA's prohibition against sexual orientation discrimination would substantially burden the defendants' religious beliefs and strict scrutiny applied, our high court concluded California had a compelling interest in ensuring full and equal access to medical treatment irrespective of sexual orientation, and there are no less restrictive means for the state to achieve that goal. (*North Coast, supra*, at pp. 1158–1159.)

The trial court is correct that *North Coast* is binding, and we are unpersuaded the circumstances here are meaningfully distinguishable such that a different result is warranted. Even if application of the law substantially burdens Miller's religious beliefs and assuming strict scrutiny applies, we disagree that the referral process favored by the

72.

trial court and defendants constitutes a less restrictive means of achieving the state's compelling interest in ensuring full and equal access to goods and services irrespective of sexual orientation because it in no way remedies the harms that the UCRA was designed to address. Merely directing customers to a separate and independent business entity which has no objection to serving them is *not* full and equal access—it in no way guarantees access to the same product or service, at the same cost, under the same conditions. Plus, this referral model does not mitigate the stigmatizing harms inflicted by a referral process—which, here, occurred in front of the couple's friends and family. It reinforces a caste system where certain individuals are treated as less deserving of products and services on the open market based on protected characteristics. (See *Catholic Charities, supra*, 32 Cal.4th at p. 565 [concluding broader religious exemption from the Women's Contraception Equity Act (Health & Saf. Code, § 1367.25 & Ins. Code, § 10123.196) was not a less restrictive means to achieve the state's interest in eliminating gender discrimination because it would increase the number of women affected by discrimination in the provision of health care benefits].) California has a compelling interest in ensuring full and equal access to goods and services irrespective of sexual orientation (see *North Coast, supra*, 44 Cal.4th at p. 1158), and there are no less restrictive means for the state to achieve this goal. The state's compelling interest would be substantially frustrated and undercut if business establishments, professing deep and sincerely held religious beliefs like those held by defendants, could withhold full and equal access to goods and services from the protected class through a referral exception or a general exception for religious objectors.

## B. Conclusion

We are unpersuaded that either *Fulton* or *Tandon* undermines *North Coast*'s conclusion that the UCRA is a neutral and generally applicable law that satisfies rational basis review. Further, we find no sufficient support for defendants' contention the CRD demonstrated hostility toward Miller's religion in violation of the neutrality that the

73.

federal Constitution's First Amendment's free exercise clause requires. Finally, assuming strict scrutiny applies, we find no basis in the circumstances presented to reach a different conclusion from *North Coast* under California's constitutional free exercise guarantee.

## DISPOSITION

The court's order is vacated and remanded for further proceedings consistent with this opinion. Costs on appeal are awarded to the CRD.

MEEHAN, J.

WE CONCUR:

DETJEN, Acting P. J.

SMITH, J.